M.P., a minor, BY D.P. his natural parent and next friend, Plaintiffs,

v.

GOVERNING BOARD OF THE GROSS-MONT UNION HIGH SCHOOL DISTRICT; Joanne Smith, individually in her official capacity as superintendent of the Grossmont Union High School District; and Arthur Pegas, individually and in his official capacity as principal of the El Capitan High School, Defendants.

No. 94–0371 K (POR).

United States District Court, S.D. California.

March 21, 1994.

James E. Cohen, California Indian Legal Services, Escondido, CA, for plaintiffs.

Eve Bermingham, Litter, Mendelson, Fastiff and Tichy, San Diego, CA, for defendants.

ORDER GRANTING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND DENYING DEFENDANT'S COUNTERING MOTION

KEEP, Chief Judge.

## BACKGROUND

The plaintiff, a seventeen year old Native American, is a senior at El Capitan High School in San Diego County. Prior to the incidents of February 1994, there was no suggestion by the plaintiff's parents, doctors or teachers that he was disabled in a manner that required special education.[1] The student had never failed a course and generally received above-average grades. He had, however, received sixteen referrals for discipline. These incidents included fighting, insubordination, and disruptive behavior.

On February 16, 1994, the plaintiff drove his family's vehicle to school and parked in the student parking lot. In the back of the vehicle was a pellet gun that the student claims he used the night before for shooting squirrels.[2] A school official noticed the gun and confronted the plaintiff. The plaintiff attempted to elicit the assistance of a second student to hide the gun for him. The school official told the student not to give his keys to any other person, but the plaintiff surreptitiously gave his keys to a third student. This third student removed the gun from the vehicle.

The plaintiff was taken into the vice-principal's office where the school official informed the vice-principal that the student had brought a firearm onto school grounds. The plaintiff and school officials then returned to the parking lot to retrieve the gun, but it was no longer in the plaintiff's vehicle. The plaintiff lied and said that the gun must have been stolen. The plaintiff and school officials returned to the vice-principal's office where the plaintiff continued to maintain his story that the gun had been stolen. The Sheriff's Department was called, and, upon being questioned by a Deputy Sheriff, the plaintiff finally admitted giving his keys to a student and instructing that student to remove the gun from the school grounds.

The plaintiff was immediately suspended from school as required under California law.[3] On February 24, 1994, a meeting was held between the plaintiff, his father, his

1. The plaintiff is legally blind in one eye.

2. The plaintiff also admitted at sometime during the pendency of the proceedings that he had brought the firearm to school on other occasions.

3. California state law provides:

The principal or the superintendent of schools shall immediately suspend, pursuant to Section 48911, any pupil found to be in possession of a

attorney, and the vice-principal of the school. At this meeting the plaintiff was informed that his suspension would be extended pending an expulsion hearing. At this February 24, 1994, meeting it was not alleged that the student was disabled.

On or about February 25, 1994, the plaintiff requested an evaluation for special education needs under the Individuals with Disabilities Education Act,[4] (hereinafter "IDEA") and Section 504 of the Rehabilitation Act of 1973.[5] Testing and evaluation was conducted on the student between February 26, 1994, and March 2, 1994. On March 3, 1994, an Individual Education Plan meeting was held.[6] At that meeting the defendant's agents, over the objection of the student, found that the student was not eligible for special education under IDEA.

On March 4, 1994, the plaintiff requested a due process hearing to review the findings of the Individual Education Plan, and informed the defendant that under IDEA, the defendant was not permitted to remove the plaintiff from his regular educational placement pending the outcome of the hearing. On March 7, 1994, the plaintiff attempted to return to school, but was sent home and informed that the defendant did not intend to admit the plaintiff during the pendency of the IDEA proceedings.

On March 8, 1994, the plaintiff filed this complaint and motion for a temporary restraining order. The student seeks an order restraining the defendant from taking any

action to exclude him from El Capitan High School. On March 14, 1994, the defendant filed a counter-claim seeking a temporary restraining order to block the plaintiff's return to school. The defendant contended that the plaintiff should not be permitted to return to school because he poses a danger both to himself and to others.

## ANALYSIS

### A. The Student's Arguments

The plaintiff has brought his request for a temporary restraining order citing IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988), the Fourteenth Amendment to the United States Constitution, and the California education laws. Because IDEA controls the present issue, I do not consider the plaintiff's other theories.

### B. Jurisdiction

Federal jurisdiction is appropriate in the present matter because the parties dispute whether the protections of IDEA apply to the plaintiff. Jurisdiction is therefore proper under 28 U.S.C. § 1331 (1988).

### C. The Individuals With Disabilities Education Act

IDEA provides an elaborate review procedure to determine if a minor is disabled and, if so, to develop a specialized program to meet the educational needs of the child.[7] At

---

firearm at school or at a school activity off school grounds and shall recommend expulsion of that pupil to the governing board. The governing board shall expel that pupil or refer that pupil to a program of study that is appropriately prepared to accommodate students who exhibit discipline problems and is not provided at a comprehensive middle, junior, or senior high school or housed at the school site attended by the pupil at the time the expulsion was recommended to the school board, whenever the principal or superintendent of schools and the governing board confirm the following:

(1) The pupil was in knowing possession of the firearm.

(2) An employee of the school district verifies the pupil's possession of the firearm.

Cal.Educ.Code § 48915(b) (West Supp.1994).

4. 20 U.S.C. § 1400 et seq. (1988).

5. 29 U.S.C. § 794 (1988).

6. Under the Individuals with Disabilities Education Act, the term an "individualized education program" means a written statement for each handicapped child developed through meetings by a representative of the educational agency who is qualified to provide or supervise the provision of specially designed instruction to meet the unique needs of handicapped children, the teacher, parents or guardian of such child, and when appropriate, the child. See 20 U.S.C. § 1401(19) (1988).

7. Parents or guardians are entitled to an opportunity to review all relevant records and are also entitled to prior written notice of any proposed change to the identification, evaluation or educational placement of the child. See 20 U.S.C. § 1415(b)(1)(A)–(C) (1988). If the parents or guardians disagree with the educational agency's

the core of the present controversy is IDEA's "stay put" provision. 20 U.S.C. § 1415(e)(3) (1988). The section states in pertinent part: "During the pendency of any proceedings conducted pursuant to this Section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child...." *Id.*

The plaintiff contends that under this section he cannot be suspended or expelled from school during the pendency of the review process. The language of the section is clear: "the child *shall remain* in the then current educational placement." Upon initiation of an Individual Education Plan and the subsequent review, therefore, a child may not be expelled or receive a lengthy suspension without the approval of his or her parents or guardian.

The defendant raises two theories under which it argues that, despite the language of the statute, the student could be expelled. First, the defendant alleges that the plaintiff's claim that he is disabled is actually a ruse intended to gain the protection of the statute—protection to which he is not entitled. Second, given the inherent potential for violence with bringing a gun to school, the defendant contends that the "stay put" provision should not apply. Regardless of the facial validity of these objections, I find that they are precluded by binding precedent.

### 1. *The Possibility that the Student is Not Disabled*

■ In *Hacienda La Puente School District of Los Angeles v. Honig*, 976 F.2d 487 (9th Cir.1992), the court expressly rejected the contention that the protection of IDEA only applied to children who had previously been determined to have disabilities. The court stated:

In enacting IDEA, Congress specifically recognized that undetected disabilities prevent many children from "having a suc-cessful educational experience." If we found that issues concerning the detection of disabilities to be outside of the scope of IDEA "due process hearings," school districts could easily circumvent the statute's strictures by refusing to identify students as disabled.

*Id.* at 492. Given the *Hacienda* decision, it is clear that the procedural safeguards of IDEA must be applied regardless of whether or not a child has been previously diagnosed as having disabilities. Surely a child who suffers a sudden, debilitating physical or mental problem deserves the protection of IDEA regardless of whether or not she or he had previously had such a condition. Given the broad sweep of IDEA, it is not surprising that it is intended to reach *all* disabled children. IDEA does not address, however, the possibility that a child who does not have a disability might misuse the statute to avoid school-imposed discipline.

■ I find the present fact pattern very disturbing. There is no indication that the plaintiff has ever required special education or even failed a course. Indeed, the defendant alleges in its papers that subsequent to the gun incident, the student's counsel first alluded to a potential lawsuit for racial discrimination against a Native American and that the issue of disabilities was never mentioned. According to the defendant, only when the school district refused to be intimidated by the alleged threat of a discrimination lawsuit did the plaintiff change tactics and claim a disability and the protection of IDEA. Certainly, there is the plausible possibility that the student is not disabled and is wrongfully attempting to gain the protection of a statute that does not apply to him. There is, however, no language in the Act that provides a remedy for a situation where a non-disabled student attempts to label himself or herself as disabled solely to gain the benefits of the statute.

■ The intent of IDEA's "stay put" provision is clear: the child *shall* remain in the then current educational placement. The po-

decision, they are entitled to an impartial due process hearing. *See* 20 U.S.C. § 1415(b)(2) (1988). Any party aggrieved by the findings of such a hearing may appeal to the State edu-cational agency. *See* 20 U.S.C. § 1415(c) (1988). Finally, any party aggrieved by the findings of the State educational agency may bring a civil action in federal court.

tential for misuse of this language, however, may have been unanticipated by Congress. Normally, when a court rules upon whether a temporary restraining order should be granted, an important factor is whether the party is likely to succeed on the merits of its claim. *See U.S. v. Nutri–Cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992). In this case, "likelihood of success on the merits" would be a showing that the plaintiff actually is disabled and thus entitled to the protection of the "stay put" provision.

The unqualified language of the provision, however, has the adverse effect of preventing the court from determining whether a plaintiff is actually entitled to the protection of IDEA. The "stay put" provision, when read in conjunction with the Ninth Circuit's *Hacienda* decision, provides an avenue by which a non-disabled child can circumvent state education laws and gain the protections of a federal statute to which he or she is not entitled. Using this combination of case law and statute, an attorney may simultaneously compel a federal judge to grant injunctive relief while preventing that judge from reviewing whether such relief is appropriate.

Of equal importance is that such action bypasses the California education laws. Such laws represent the careful balance struck by state legislators between the rights of individual students to a public education and the rights of all students to a safe educational environment. The "stay put" provision and the *Hacienda* decision, in conjunction, act to severely restrict school officials of their power to discipline and to maintain a safe school environment. Indeed, as this present case suggests, if a child brings a gun to school, a parent or guardian's response could simply be to claim that the child is disabled and therefore bypass the laws' discipline procedures of suspension and expulsion.

■ I understand that the parents of the other children at El Capitan high school will be shocked to think that classmates of their children could bring a gun to school and then escape suspension or expulsion by claiming a heretofore undetected disability. Further, I am sympathetic with the school's argument that it undercuts discipline that the powerful protections of IDEA can be invoked without

requiring any threshold burden of proof on the part of the student who claims to be disabled. As this case suggests, the statute may be misused so that school children can be exposed to the dangers inherent in the bringing of a firearm to school while the student responsible for bringing the gun escapes the consequences of the action. Nonetheless, the court's jurisdiction is limited to determining whether maintaining the plaintiff's current placement is substantially likely to result in injury to the student or to others. *See infra* Pt. D. The validity of the plaintiff's underlying claim that he is entitled to the protections of IDEA is not an issue the court is empowered to determine.

Although I am not empowered to rule upon the validity of plaintiff's claims due to IDEA's "stay put" provision, I do note that the plaintiff has benefited greatly from his invoking of the statute. The plaintiff is a senior who was facing expulsion and thus would not have graduated with his class. Because IDEA's hearing process will take several months to complete, even if the student is ultimately found to be not disabled, by invoking IDEA the plaintiff will achieve the goal of graduating with his class and avoiding expulsion.

### 2. *Can a School Unilaterally Expel a Student Due to Violence?*

■ A second argument against permitting the plaintiff to return to school is that violence could potentially occur. The defendant may not, however, unilaterally remove the student from his or her educational environment even if the defendant believes that the plaintiff is violent. The Supreme Court expressly rejected the argument that there was a "violence exception" to the "stay put" provision of IDEA that would permit such a unilateral action by a school. *See Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

■ The Court did hold in *Honig,* however, that school officials could seek injunctive relief to remove a child from his or her current educational environment. The Court held that "[t]he stay put provision in no way purports to limit or preempt the authority

conferred on courts...." *Id.* at 327, 108 S.Ct. at 606. The Court continued by stating that the stay put provision did not operate "to limit the equitable powers of district courts such that they cannot, in appropriate cases, temporarily enjoin a dangerous disabled child from attending school." *Id.* The defendant has brought such a motion for a temporary restraining order seeking to block the plaintiff's return to school.

### D. Is the Student Dangerous Pursuant to Section 1415(e)(3)?

■ The Court in *Honig* set out the standard for court review of an allegation that a child is too dangerous to remain in his or her then current educational placement:

> In any such action, § 1415(e)(3) effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is *substantially likely* to result in injury either to himself or herself, or to others.

*Id.* at 328, 108 S.Ct. at 606 (emphasis added). I shall therefore consider the evidence in this case recognizing that the burden is upon the defendant to demonstrate that there is a substantial likelihood that injury will result if the plaintiff returns to school.

### 1. The Student's Alleged Condition

The plaintiff asserts that he is suffering from Attention Deficit Disorder, a diagnosis with which the school psychologist disagrees. Although it is disputed whether the student actually has this disability, I shall assume for the purposes of this determination of dangerousness that he does have the disorder.[8] I must therefore consider both the potential for dangerousness inherent in such a condition and the student's history of misbehavior at school.

As a preliminary matter, I note that the results of the psychological testing performed on the plaintiff were apparently not consistent with an individual who has Attention Deficit Disorder with hyperactivity.

The student counters this by arguing that his disability is Attention Deficit Disorder without hyperactivity and notes that such a condition is recorded in the *Diagnostic and Statistical Manual of Mental Disorders* 94 (3d ed. rev. 1987). Upon review of this treatise, I note that this disorder is referred to as "undifferentiated attention-deficit disorder," and that the "predominant feature is the persistence of developmentally inappropriate and marked inattention." *Id.* at 95. Given this definition, it does not appear that dangerousness is necessarily a symptom of this disorder. I also note, however, that the text continues, "Research is necessary to determine if this is a valid diagnostic category and, if so, how it should be defined." *Id.*

It therefore appears that it cannot be assumed that the student would knowingly initiate violent activity because of his disorder. This is not in itself determinative. The Supreme Court in *Honig* did not hold that there must be a substantial likelihood that the student would knowingly initiate violence, but rather that returning the student presented a substantial likelihood that injury would "result." Because of this, it must be considered whether the plaintiff's purported marked inattention could itself result in injury.

### 2. Arguments On the Issue of the Student's Dangerousness

The plaintiff contends that the defendant has confused the term "impulsive" with "violent" and that the defendant makes "the obtuse claim" that the student's attention deficit disorder would somehow make him likely to attack someone. Regardless of whether or not the plaintiff accurately describes the defendant's arguments, this misstates the analysis I must perform. The Supreme Court referred to a "dangerous child" not a "violent child" and it referred to resultant "injury" not resultant "attacks." Injury due to inadvertence would therefore qualify as a ground for excluding the student from school.

---

8. If the plaintiff does not have Attention Deficit Disorder, he would not be entitled to the protections of IDEA. The plaintiff could, therefore, be expelled from school. In order to be entitled to the protections of the Act, therefore, it must be assumed that the plaintiff has the disorder.

Concerning the defendant's arguments that the student is too dangerous to be permitted to return to school, I note that the defendant has listed previous disruptive behavior on the part of the plaintiff. This prior misconduct includes knocking over a bookshelf, a fight with another student, throwing modelling clay, and insubordination. It is the defendant's position that given this history, plus the fact that the plaintiff has access to a firearm, it would be too dangerous to permit the student to return to school. I note, however, that the plaintiff's parents have filed declarations in which they state that the plaintiff no longer has access to the gun at issue. It appears, therefore, that the possibility of a firearm exacerbating the plaintiff's previous inappropriate behavior has been eliminated.

I find significant the absence of a declaration by the school psychologist on the issue of the student's dangerousness. Indeed, although the school psychologist provided a declaration in which he opined that the plaintiff was ineligible for special education, he did not suggest that the student would be dangerous either intentionally or through inadvertence. I note that although the school psychologist found that the plaintiff had a "clinically very significant level of impulsivity," he did not suggest that this impulsivity would likely result in injury to the student or others.

I also note that the student has provided a declaration from his supervisor at his after-school job where the plaintiff has worked for approximately three years. The plaintiff's supervisor states that he has never observed the plaintiff exhibit inappropriate behavior nor has he ever observed the student raise his voice or threaten anyone. This declaration, therefore, suggests that the plaintiff has controlled his impulsivity in the past.

Finally, I note that in *Honig* and *Hacienda*, the Supreme Court and the Ninth Circuit held that expulsion was not appropriate. This was despite the violent nature of the students' actions in those cases. The student in *Honig* choked a fellow student with sufficient force to leave abrasions on the child's neck and kicked out a school window. *Honig*, 484 U.S. at 313, 108 S.Ct. at 598–99. In *Hacienda*, a student with a long history of academic and emotional problems frightened a second student with a stolen starter pistol. *Hacienda*, 976 F.2d at 489. Despite the presence of the starter pistol, the Ninth Circuit held that expulsion was inappropriate. In the present case, although the bringing of a gun to school could result in violence, the plaintiff did not attempt to use the gun, nor did he show the gun off and create the possibility of an accidental shooting.

Given all of the facts before me, I cannot find that there is a substantial likelihood that the return of plaintiff to school would result in injury to himself or others. The test results reveal that the plaintiff is impulsive, but I hold that there is insufficient evidence of dangerousness according to the definition provided in *Honig*.

I note, however, that the Supreme Court in *Honig* stated that the "stay put" provision does not leave educators completely hamstrung. The Court noted that the provision does "not preclude the agency from using its normal procedures for dealing with children who are endangering themselves or others." *Honig*, 484 U.S. at 325, 108 S.Ct. at 605. I do not have information concerning what the school's "normal procedures" are in such a situation, but I note that at issue is possible injury resulting from the plaintiff's inattention. It appears reasonable, therefore, that the school could limit the student's activities so that inattention would not result in injury. Specifically, as examples, the plaintiff could be prohibited from using shop equipment, motor vehicles or other mechanical or powered equipment on school property due to the possibility that the student's inattention could lead to injury.

## CONCLUSION

In sum, this court holds that the "stay put" provision of IDEA precludes judicial evaluation of the plaintiff's likelihood of success on the merits. Further, although the record indicates that the plaintiff has been a discipline problem, it does not support a finding that he is *substantially* likely to injure himself or others. Thus:

1. The plaintiff's motion for a temporary restraining order is GRANTED. The defendant is ordered to not take any action to exclude the plaintiff from El Capitan High School.

2. The defendant's motion for a temporary restraining order is DENIED. The court finds that the plaintiff does not represent such a danger to himself or to others that changing his current educational placement would be appropriate.