**RODIRIECUS L. and Betty H., as natural parent and next friend of Rodiriecus L., Plaintiffs–Appellees,**

v.

**WAUKEGAN SCHOOL DISTRICT NO. 60 and Alan Brown, in his official capacity as Superintendent of District 60, Defendants–Appellants.**

No. 95–2459.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1995.

Decided July 25, 1996.

Marcia S. Pierce, Mark Reyes (argued), Prairie State Legal Services, Inc., Waukegan, IL, David Wolowitz, Prairie State Legal Services, Inc., Carol Stream, IL, for plaintiffs–appellees.

Thomas A. Morris, Jr. (argued), George E. Riseborough, Monica J. Conrad, Brydges, Riseborough, Morris, Franke & Miller, Chicago, IL, for defendants–appellants.

Before WOOD, Jr., COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The Waukegan School District of Illinois appeals the district court's granting of a preliminary injunction preventing the expulsion of Rodiriecus L. from middle school, pursuant to the stay-put provisions of the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(e)(3). We reverse and remand.

## I. FACTS

Rodiriecus L. was born on June 7, 1981. In August 1993, after a juvenile adjudication where Rodiriecus admitted to robbery, guardianship of the child was transferred from his mother to the Illinois Department of Children and Family Services (DCFS) who placed him in a residential program. In October 1994, for reasons unrevealed in the record, Rodiriecus's mother received custody of the child (although DCFS remained as guardian) and he was enrolled in the seventh grade at Abbott Middle School, in Waukegan, Illinois. In Rodiriecus's first three months at the school, he was disciplined five times for acts described in the record as "insubordination" or "lack of respect" for others. Each time, Rodiriecus was sent to the school's "Alternative Learning Center" for a day.

On November 1, 1994, several teachers at Abbott Middle School reported that cash had been stolen from locked classrooms the night before. Also, a set of master keys to the classrooms was reported as missing from a desk in the principal's office. In early January 1995, a number of additional thefts from locked classrooms occurred at the school. On January 25, 1995, a teacher and a security guard at the school discovered Rodiriecus in possession of a master key to the classrooms. After meeting with the school principal, Rodiriecus was turned over to the custody of the Waukegan Police Department. At the police station, Rodiriecus made a voluntary, written confession, admitting to taking the master key from the principal's office after school in November and using the key to enter the classrooms at night to pilfer the teachers' desks. The next day, January 26, the principal received the police report and suspended Rodiriecus from school for ten days. The principal recommended to the school board that they initiate proceedings to expel Rodiriecus for the remainder of the school year as punishment for the confessed thievery.

On February 15, Rodiriecus's DCFS caseworker contacted the school board, suggesting that Rodiriecus might be disabled and suffering from an emotional disorder and that he should undergo a special education case study pursuant to the Individuals with Disabilities Education Act and Illinois Administrative Code. On February 16, Rodiriecus's attorney requested a due process hearing and demanded that Rodiriecus remain in school pending the results of the hearing. The local Waukegan school board initiated a

case study to determine whether Rodiriecus required special education and forwarded the due process hearing request to the Illinois State Board of Education. Meanwhile, on February 20, the local school board decided to expel Rodiriecus from the public school's regular education program for the remainder of the school year for the admitted thievery.

Eight days thereafter, on February 28, Rodiriecus L. filed suit in federal district court, seeking a preliminary injunction to compel the school district to allow Rodiriecus to return to school, pursuant to the Individuals with Disabilities Education Act ("IDEA" or the "Act"). Rodiriecus asserted that under the Act, because he was being evaluated for special education purposes, the school district was prohibited from expelling him from school. The district court issued a temporary restraining order in March 1995 ordering the school district to allow Rodiriecus to return to school. After the court denied the school district's motion to dissolve the temporary restraining order, the order was extended in effect through April and May to allow briefing for a preliminary injunction. In April 1995, the local school board held a "multi-disciplinary conference" and evaluated Rodiriecus, determining that Rodiriecus was not disabled and did not require special education. Although neither Rodiriecus nor the DCFS attended the conference, the school psychologist, the school nurse, three teach-ers, and a certified language pathologist all agreed that Rodiriecus was not disabled and thus not eligible for special education services.

However, despite the school board's objection that Rodiriecus was not a disabled child eligible for coverage under the Act, the district court issued a preliminary injunction in May, ruling that the Individuals with Disabilities Education Act required that while Rodiriecus was pursuing administrative remedies to determine whether he was eligible for special education, the school district was barred from expelling Rodiriecus from school. The school district appeals this decision.[1]

## II. ANALYSIS

Congress passed the Individuals with Disabilities Education Act (the "IDEA") to "assure that all *children with disabilities* have available to them ... a free appropriate public education...." 20 U.S.C. § 1400(c).[2] The Act requires States, in order to qualify for certain financial assistance, to assure that "all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated ..." *Id.* at § 1412(2)(C). The Act seeks to ensure, to the "maximum extent appropriate," that children with disabilities are educated alongside

---

1. After the preliminary injunction was granted and the appeal taken, the hearing officer appointed by the Illinois State Board of Education held a hearing and, on July 27, 1995 ruled that Rodiriecus was not disabled and did not require special education. Rodiriecus appealed this adverse decision to a Level II administrative tribunal. *See* 20 U.S.C. § 1415(b). On December 21, 1995, after oral argument, the Level II hearing officer issued his decision, concluding that Rodiriecus was not disabled and did not qualify for special education services. As provided for under section 1415 of the IDEA, Rodiriecus has appealed the decision of the Level II officer to federal district court.

   The appellant school district seeks to supplement the record on appeal with a copy of the Level I hearing officer's conclusion and the Level II officer's report as well as the accompanying documents submitted to the Level II officer to establish that Rodiriecus was not in fact disabled. However, the issue in this case is not whether Rodiriecus is disabled, but whether the district court properly issued a preliminary injunction to keep Rodiriecus in school when he had not previously been diagnosed as disabled or recommended for special education. Not only were the administrative materials not before the district court, but their conclusions are still in the process of appeal. *See United States v. Hillsberg*, 812 F.2d 328, 336 (7th Cir.) (stating that "Rule 10(e) [of the Federal Rules of Appellate Procedure] does not give this court authority to admit on appeal any document which was not made part of the record in the district court.") (quotation omitted), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987).

2. The Act defines children with disabilities to mean "children with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." 20 U.S.C. § 1401(a)(1)(A)(i).

those children who do not have disabilities. 20 U.S.C. § 1412(5). The primary substantive right created to implement the congressional goals of appropriate public education for children with disabilities is the "individualized education program" (commonly known as the "IEP"), which the Act mandates must be structured for each individual disabled child. *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). The individualized education program is a written statement prepared by the school district after conferences and meetings between the child's parents, the child's teacher, and school district representatives, that sets forth the child's educational level and performance and establishes annual goals and short term instructional objectives. *Id.* at 311, 108 S.Ct. at 597; 20 U.S.C. § 1401(20).

As well as providing substantive rights for the education of children with disabilities, the Act also mandates that state educational agencies "establish and maintain procedures in accordance with [the Act] to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units." 20 U.S.C. § 1415(a).

Under the procedural rules of the Act, if the parents (or guardian) of a disabled child object to some aspect of the child's educational program, the parents are entitled to an "impartial due process hearing" before a local educational agency. 20 U.S.C. § 1415(b)(2). Local agency decisions may be appealed to a state educational agency, and if this forum proves unsatisfactory, the parents may bring a civil action in state or federal court. 20 U.S.C. § 1415(c), (e)(2).

Importantly, the Act mandates that during the pendency of the often lengthy administrative and judicial appeals process, the disabled child is to remain in his or her then current educational program. This is the so-called "stay put" provision, which provides in full:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, *the child shall remain in the then current educational placement of such child.*

20 U.S.C. § 1415(e)(3)(A). "The purpose of the stay-put provision is to give the child's parents the choice of keeping the child in his existing program until their dispute with the school authorities is resolved." *Board of Educ. of Oak Park v. Illinois State Bd. of Educ.,* 79 F.3d 654, 659–60 (7th Cir.1996). The Supreme Court has stated that the stay put provision was "very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig,* 484 U.S. at 323, 108 S.Ct. at 604. Although the stay put provision has no emergency exception for incorrigible, dangerous, or disruptive students, school districts are free to impose detentions, "time outs," and suspensions of up to ten days to deal with disruptive children, and if these measures fail and the parents do not agree to a change in educational placement, a school can seek a court order under section 1415(e)(2) to remove a dangerous student from his or her educational program. *See* Gail Sorenson, "The Many Faces of the EHA's 'Stay–Put' Provision," 62 *Educ. Law Rep.* 833, 837 (1990).

In Rodiriecus's case, after the Waukegan school district instituted expulsion procedures, Rodiriecus's guardian requested a disability evaluation and petitioned the district court for a preliminary injunction under the stay put provision to order the school district to keep Rodiriecus in school. The district court granted the preliminary injunction, concluding that the stay put provision should apply to all children who request a disability evaluation; the school district appeals, arguing that Rodiriecus has never been diagnosed as disabled and therefore the stay put provision should not be applied.

■ Whether the stay put provision applies to a child not yet diagnosed as disabled is a question of first impression in this circuit. The Ninth Circuit has held that a hearing officer may conduct a hearing regarding a child's educational placement under the IDEA, even though the child has yet to be identified as disabled. *Hacienda v. Honig,* 976 F.2d 487, 492 (9th Cir.1992). The

*Hacienda* decision comports with congressional intent because one of the statutory duties of a hearing officer is to "identify" those children that are disabled and to resolve any disputes between parents and school districts as to whether a particular child is disabled or not. *Id.* However, *Hacienda* did not directly address whether the stay put provision applies to prevent expulsion proceedings for a student that had not been diagnosed as disabled. Nevertheless, in *M.P. v. Governing Board of Grossmont Union*, 858 F.Supp. 1044 (S.D.Cal.1994), the district court saw fit to enlarge upon the holding of *Hacienda* and found (albeit with reluctance, for the student had brought a firearm into school) that the stay put provision *automatically* applied whether or not a student had been previously diagnosed or suspected of having a disability. *Id.* at 1047. In contrast to the approach in *M.P.*, a district court in Wisconsin recently applied the stay put provision to a child who was not then diagnosed as disabled, but only *after* finding that the child had some chance of successfully proving to a hearing officer that he was in fact disabled due to a doctor's diagnosis and a teacher's recommendation that he be enrolled in special education classes. *Steldt v. School Bd. of Riverdale*, 885 F.Supp. 1192, 1198 (W.D.Wis.1995). We agree with *Steldt*'s more flexible approach in applying the stay put provision to children who have not yet been diagnosed as disabled.

If the stay put provision is automatically applied to every student who files an application for special education, then an avenue will be open for disruptive, non-disabled students to forestall any attempts at routine discipline by simply requesting a disability evaluation and demanding to "stay put," thus disrupting the educational goals of an already overburdened and of times classified as a chaotic public school system. In fact, the emergence of this practice has been noted and criticized. *See* Omyra M. Ramsingh, "Disciplining Children with Disabilities under the Individuals with Disabilities Act," 12 *J. Contemp. Health L. & Policy* 155, 172 (1995); Congressional Testimony of Boyd W. Boelje, President, National School Boards Assoc., before House Subcommittee on Select Education and Civil Rights, July 19, 1994 ("In some cases IDEA is manipulated by students who do not even have a disability. The student neither has any history of requesting special education services nor any creditable basis for claiming a disability."); Stuart Anderson, *Why Schools Don't Dare Discipline the Disabled,* Weekly Standard, Feb. 19, 1996 at 29.

However, a per se rule that prevents application of the stay put provision to students not yet diagnosed with a disability is equally inflexible and inappropriate because there may arise circumstances where a truly disabled child, who has not been as yet identified by the school board or who has been misidentified, is improperly denied appropriate public education. In those situations, the stay put provision is necessary to keep the student in school until the hearing officer has resolved the dispute.

In applying a reasonable rule like the court in *Steldt*, we start with the proposition that the stay put order is a preliminary injunction. *Bd. of Educ. of Oak Park,* 79 F.3d at 657 (observing that a "stay put" order is "sufficiently clear and definite to be enforceable by the usual sanctions for violating an injunction—civil or criminal contempt—so that the order has not only the form of an injunction but also the bite that a real injunction has."); *see also Cronin v. Board of Educ. of East Ramapo,* 689 F.Supp. 197, 202 (S.D.N.Y.1988). Various courts have described the stay put provision as an "automatic injunction" applicable whenever the statutory criteria of § 1415(e)(3) are met. *See Honig,* 484 U.S. at 326, 108 S.Ct. at 605; *Cronin,* 689 F.Supp. at 202; *Cochran v. District of Columbia,* 660 F.Supp. 314, 319 (D.C.D.C.1987). In most cases, the identification of disability in stay put proceedings is not an issue for there is no question that the child is disabled.[3] *See Wise v. Ohio Dept. of Educ.,* 80 F.3d 177, 181 (6th Cir.1996) (interpreting stay-put provision for severely retarded child functioning "below the level of a one-year old infant"); *W.B. v. Matula,* 67 F.3d 484, 488 (3d Cir.1995) (interpreting stay

---

**3.** Occasionally there is a question as to whether the actions requiring discipline are *related* to the disability, but that question is not before the court today.

put provision for child whose teacher identified the child as suffering from Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder); *Bd. of Educ. of Oak Park,* 79 F.3d at 655 (interpreting stay put provision for autistic 23–year old who cannot speak or attend to basic self-care needs). However, in Rodiriecus's case, the statute is not· definitive as to whether it applies to students such as Rodiriecus who have not been diagnosed as disabled. In such cases, we believe it is wise, as the district court in *Steldt* did, to look at the traditional factors (in light of scientific or psychological reports and teacher evaluations) in deciding whether or not to grant a preliminary injunction.

■ In deciding whether to grant a preliminary injunction, a court must weigh four factors: (1) the movant's likelihood of success on the merits of his claim; (2) the irreparability of the harm to the movant if the injunction does not issue; (3) whether the harm to the movant outweighs the harm to the nonmovants; and (4) the public interest. *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993).

■ Although we agree with *Steldt* that a child must have some chance of successfully being declared disabled in order to apply the stay put rule, this is not an open-ended test that can be broadly applied, as was the case in *Steldt.* We wish to make clear that parents of other young offenders should not conclude that they can use this approach to allow the hindsight opinion of some "expert" to qualify a delinquent child for preliminary protections under the Act. For a child not previously diagnosed as disabled, the statement of one social worker, teacher, or doctor excusing a child's aberrant behavior because of some perceived problem should be considered insufficient to meet the standard of "staying put." Rather, courts should defer to the policy makers at the Office of Civil Rights of the U.S. Department of Education who have issued an opinion letter after considering the problem setting forth the test that should apply in the future for the granting of injunctive relief under IDEA's "stay put" provision: *The student must be or reasonably should have been determined to be eligible through the administrative proce-*

*dures of the IDEA. OSEP Memorandum No.* 95–16, 22 IDELR 531, 540 (OSEP, April 26, 1995). *See generally Metropolitan School Dist. of Wayne Township v. Davila,* 969 F.2d 485, 490 (7th Cir.1992) (recognizing that Department of Education has inherent authority under IDEA to inform public of procedures and standards applied, that agency may issue policy letter to do so pursuant to that authority). Thus, before a court invokes the IDEA placement protection provision, petitioners must reasonably demonstrate that school officials knew of, or should have known of, a student's genuine disability.

There is no doubt that the expulsion of a disabled child from school may result in irreparable harm. *Steldt,* 885 F.Supp. at 1198. However, where, according to the record, school officials neither knew nor should have known of a student's genuine disability under the IDEA, then the balance of harms tips towards the school district's interest in fulfilling its obligation to give quality education to students and maintaining strict discipline, so necessary today in our schools, while protecting students and teachers from dangerous and incorrigible students (not to mention the lessons in personal responsibility learned in school, applicable in the adult world where there is no IDEA to interfere with law enforcement).

■ Applying the foregoing discussion to Rodiriecus L.'s case, it is apparent that the school officials had neither knowledge nor reasonable suspicion to base a rational decision that Rodiriecus L. was in fact disabled. In fact his academic performance, although not outstanding, did not raise their suspicions and they deemed it "average." Neither the parent nor the guardian nor Rodiriecus requested any special education during his period of enrollment at Abbott Middle School. Indeed the record reflects that not one single individual, teacher, guardian, parent of school official, proposed or suggested that Rodiriecus may be in need of special education. Only when Rodiriecus was presented with expulsion for his acts of alleged burglary did the child's guardian (the DCFS) seek an evaluation and injunction to force the school district to allow Rodiriecus to remain in public school. It is interesting to note that even at the time the temporary restraining order was sought there was no request for special

education for the student; the demand was simply that Rodiriecus remain in school.[4]

There may very well be instances where disabled children, unidentified by the school district, are entitled to and indeed may need the protection of the IDEA. For instance, a child clinically diagnosed with an emotional or learning disorder, yet not receiving a special education program may be threatened with failing out of school. However, this is not one of those instances. There is nothing in the record to indicate that Rodiriecus requires any special education. Indeed, until the expulsion proceedings, there was no request for an IEP or any form of special education.

The IDEA was intended to provide individualized public education for disabled children. The Act was not designed to act as a shield to protect a disruptive child from routine and appropriate school discipline. The stay put order issued by the district court for a student not identified by either the school district, school officials, social workers, or medical professionals as disabled was premature. The order is REVERSED and the case REMANDED to the district court for proceedings consistent with this opinion.

4. We fail to understand the actions of the DCFS in this case. From our review of the record, there seems to be a pattern of obstruction and litigation spawned by the DCFS, a government agency, against the local school district. It has been over a year since the school district sought to expel Rodiriecus for the remainder of the 94–95 school year for the alleged commission of criminal acts. We think the DCFS tactics of delay and litigation hardly serve the best interests of the child or the school system and draw valuable resources away from the school district, resources that would be better spent in the care and education of our children.