115 F.3d 1273
 65 USLW 2813, 118 Ed. Law Rep. 881,
22 A.D.D. 778
 John DOE, by and through his parents and next friends and
the class of all others similarly situated, Jane
Doe, next friend and Joe Doe, next
friend, Plaintiffs and
Counter-Defendants-Appellants,
v.
BOARD OF EDUCATION OF OAK PARK & RIVER FOREST HIGH SCHOOL
DISTRICT 200, Nancy Smiley, Donald Offermann, Stephen C.
Bruner, both in their official capacities and as
individuals, et al., Defendants and Counter-Plaintiffs-Appellees.
 No. 96-3014.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 11, 1997.
Decided May 27, 1997.
As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc June 23, 1997.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division; Charles P. Kocoras, Judge. No. 94 C 6449.
 Robert A. Wolf, Wolf & Norris, Oak Park, IL, Bonnie L. Beck-Fries, Mary D. Cahill, Susan E. Einspar-Wayne (argued), Cahill, Einspar-Wayne & Associates, Hinsdale, IL, for Plaintiffs and Counter-Defendants-Appellants.
 John A. Relias (argued), James J. Zuehl, Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Defendant-Appellee Board of Education of Oak Park & River Forest High School District 200.
 Dennis J. Dimsey, Leslie A. Simon, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Amicus Curiae.
 Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff John Doe ("John") was a recently enrolled, 13-year-old freshman at Oak Park & River Forest High School ("OPRF"), when he was accused of being in possession of a pipe and a small amount of marijuana at a freshman dance on September 9, 1994. John was a special education student who had been identified as having a learning disability. The OPRF Board of Education (the "Board") issued a ten-day suspension in accordance with its Code of Conduct and thereafter expelled John for the remainder of the fall semester.
 
 
 2
 On September 23, 1994, the Does filed a due process hearing request under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA"), asserting that OPRF's determination that John's conduct was unrelated to his disability was inadequate. On December 12, 1994, the Level I hearing officer upheld the Board's actions, agreeing with the Board's determination that John's actions were not related to his disability. On July 25, 1995, the Level II hearing officer reversed, concluding that OPRF's failure to stay John's placement or provide alternative educational services had violated John's due process and IDEA rights in several respects.
 
 
 3
 On October 26, 1994, the Does filed an eight-count complaint in the district court in the Northern District of Illinois, alleging that John's expulsion violated his Fourteenth Amendment due process rights as well as other constitutional and statutory rights. Count 8 of the Does' complaint alleged violations of the IDEA. OPRF's motion for summary judgment on all of the Does' complaint except Count 8 was granted on October 11, 1995, following the district court's determination that the procedures OPRF followed in making its decision to expel John afforded him adequate due process.
 
 
 4
 Also on October 11, 1995, OPRF filed a counterclaim appealing the Level II hearing officer's decision. The parties then filed cross-motions for summary judgment on Count 8 of the Does' complaint and OPRF's counterclaim. The district court granted summary judgment in favor of OPRF on both issues on July 10, 1996. The district court found that the IDEA did not require OPRF to continue to provide educational services to a student who has been expelled for reasons unrelated to his disability and that, by his actions, John forfeited his right to the "free appropriate public education" required by the IDEA. Similarly, the court found that OPRF was not required by the IDEA to stay John's placement during the due process hearings absent a relationship between the misconduct at issue and the child's disability. With respect to OPRF's counterclaim, the district court determined that the Level II hearing officer had relied on certain facts that were not properly dispositive of the issue at hand. The court found that OPRF had "reasonably protected" John's rights and that its decision was reasonably informed; thus the court concluded that OPRF had properly found that John's misconduct was not related to his learning disability.
 
 
 5
 The plaintiffs appeal each of the district court's decisions,[1] and we affirm.I.
 
 
 6
 Despite his learning disability, John has been mainstreamed in all academic areas since the 19911992 school year. On February 16, 1994, a Multidisciplinary Conference ("MDC") was held to consider John's graduation from junior high school and his admission into high school. OPRF personnel recommended that John receive the services of a resource room for learning disabilities support and that he not take biology as a freshman. However, Mrs. Doe requested the elimination of these services and enrolled John in biology.
 
 
 7
 John and his parents have acknowledged that they received copies of OPRF regulations on the use of illegal substances in connection with John's participation in a sport where the use of illegal substances was prohibited (R. 59 at 11-12). In addition, on the morning of September 9, 1994, the school district's rules of conduct, including rules relating to illegal substances, were reviewed for all students during a homeroom period, and John admitted he was there at the time the rules of conduct were explained (R. 44, Ex. A at 19; R. 80 at 4). It was later that night that John was discovered in possession of marijuana at the freshman dance.
 
 
 8
 On September 19, 1994, OPRF conducted another MDC for John that had the purpose of determining whether his misconduct in bringing the marijuana to school was related to his learning disability. The MDC team determined that no such relationship existed. None of John's current teachers or former service providers from his junior high school were in attendance, and of the MDC team, only the school psychologist, Dr. DeRose-Ihrig, had spoken with John or reviewed his record prior to the MDC. OPRF refused the Does' request that OPRF provide John with an Attention Deficit Hyperactivity Disorder ("ADHD") evaluation prior to determining whether his behavior was related to his disability, although Dr. DeRose-Ihrig noted the need for an ADHD evaluation. The MDC team also reiterated that John was eligible for learning disability resource and support services. The resource room recommendation which had been made at the February 1994 MDC and eliminated at Mrs. Doe's request was reinstated by the MDC team.
 
 
 9
 A separate hearing was also convened on September 19, 1994, to consider John's expulsion. John and his parents were represented by an attorney, who presented a case based on mitigation. The attorney presented witnesses and other testimony, cross-examined OPRF witnesses and otherwise advocated for John. The hearing lasted five hours and was tape recorded. A "Summary of Evidence" from the hearing was submitted to the Administrative Review Committee ("ARC"), which was comprised of school district administrators, and the ARC recommended that John be expelled for the remainder of the semester in accordance with the OPRF Code of Conduct. The Does were not allowed to object, correct or supplement the Summary of Evidence. Around September 22, 1994, the ARC's recommendation was accepted by the Board, and John was expelled.
 
 Standard of Review
 
 10
 Whether a school district has satisfied the requirements of the IDEA is a mixed question of law and fact, which this Court reviews de novo. Board of Education of Murphysboro v. Illinois State Board of Education, 41 F.3d 1162, 1166 (7th Cir.1994). Absent a mistake of law, this Court must review the district court's decision for clear error. See id. at 1166-1167. We review de novo all other issues on which the district court granted summary judgment. See Border v. City of Crystal Lake, 75 F.3d 270, 272 (7th Cir.1996).
 
 II.
 
 11
 Alternative Educational Services Requirement
 
 
 12
 The Does first argue that the IDEA required OPRF to offer alternative educational services to John during the time his due process hearing was pending. Their primary argument in this regard is that the Department of Education's Office for Special Education Programs ("OSEP"), the federal government entity which is responsible for administering the IDEA, has interpreted the IDEA to require the continuation of appropriate alternative services for any students with disabilities who are expelled from their regular classroom setting, regardless of the relationship of a student's misbehavior to his or her disability. The Does assert that OSEP's interpretation must be binding here, when the controversy is between a school district and a student on whose behalf the school district accepts federal funds, citing Metropolitan School District of Wayne Township v. Davila, 969 F.2d 485, 493 (7th Cir.1992), certiorari denied, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 740. Moreover, they believe that OSEP's interpretative ruling is persuasive and accordingly entitled to deference, based on the IDEA, its legislative history and judicial precedent, citing Kaelin v. Grubbs, 682 F.2d 595, 600, 602 (6th Cir.1982); S-1 v. Turlington, 635 F.2d 342, 348 (5th Cir.1981), certiorari denied, 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473; Board of Education of the City of Peoria v. Illinois State Board of Education, 531 F.Supp. 148, 151 (N.D.Ill.1982). On behalf of the Department of Education, the United States, as amicus curiae, has filed a brief in this Court in support of this argument for reversal.[2]
 
 
 13
 The provision of the IDEA in question provides that in order to qualify for federal funds, a state must show that it "has in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1). The crux of the issue at hand appears to be on which word in the preceding provision the parties place the emphasis. The Does and OSEP emphasize the "all" in that phrase, and note that there is no exception in the IDEA for termination of services for misbehavior unrelated to a child's disability. Therefore, they argue, OPRF was required to provide John with special education services during his expulsion. OPRF and the district court, on the other hand, emphasize the word "right," concluding that, like other rights, it may be forfeited and assert that is just what happened in this case.
 
 
 14
 As discussed in more detail in the next section of this opinion, the Supreme Court's decision in Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686, is not dispositive on this issue, in that the Court's decision was limited to holding that under the "stay-put" provision of the IDEA students with disabilities may not be expelled unilaterally for misconduct "growing out of their disabilities." Id. at 308, 108 S.Ct. at 596 (emphasis added). In addition, the only other Circuit until recently to rule on this issue held that if a handicapped child's misconduct is properly determined in an MDC not to be a result of his or her handicap, then the child can be expelled and during the expulsion all educational services may cease. Doe v. Maher, 793 F.2d 1470, 1482 (9th Cir.1986), affirmed as modified sub nom., Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686. The Ninth Circuit reasoned that:
 
 
 15
 When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. Therefore, when a handicapped child is properly expelled, the school district may cease providing all educational services--just as it could in any other case. To do otherwise would amount to asserting that all acts of a handicapped child, both good and bad, are fairly attributable to his handicap. We know that is not so.
 
 
 16
 Id. This part of the Ninth Circuit's opinion was left undisturbed by the Supreme Court on certiorari in Honig v. Doe.
 
 
 17
 The Fourth Circuit has recently addressed the exact issue at hand in an en banc decision in Virginia v. Riley, 106 F.3d 559 (4th Cir.1997). In that case, the United States Department of Education had threatened to withhold Virginia's entire IDEA grant for fiscal years 1994 and 1995 unless Virginia changed its policy allowing the state to cease providing free education to disabled students who are expelled for misbehavior unrelated to their disabilities. Virginia argued inter alia that in order to place conditions on a state's receipt of federal funds, Congress must clearly show an unambiguous intent to do so in the terms of the statute, and that the IDEA showed no such intent. The Fourth Circuit, sitting en banc, agreed, finding that the "plain language of the IDEA does not, even implicitly, condition the receipt of IDEA funding on the continued provision of educational services to disabled students who are expelled ... due to serious misconduct wholly unrelated to their disabilities." Id. at 561.
 
 
 18
 There is no need to reiterate the entirety of the Fourth Circuit's reasoning on this matter, but a few points bear repeating: First, the court emphasized that § 1412(1) only required the State to provide "all" handicapped children with the "right" (i.e., access) to a free appropriate public education, "[a]nd, as with any other right, that right of access to educational services may be forfeited by criminal or other conduct antithetical to the right itself." Id. at 563. The court found that nothing in the purpose of the IDEA required a contrary holding, noting the codified purpose of the IDEA, which is "to have available to [disabled students] ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(c) (emphasis added). Moreover, the court--relying on South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171, and Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694--found that, even if another interpretation of § 1412(1) were possible:
 
 
 19
 [N]either the text of section 1412(1), the legislative history, nor the purpose of the IDEA even suggests, much less mandates with the clarity necessary to confirm that the Congress actually confronted and deliberately decided, that a state must continue to provide education services to disabled children after expulsion for misconduct unrelated to their disabilities.
 
 
 20
 Id. at 568. Therefore, it held the Department of Education's contrary position ultra vires. Id.
 
 
 21
 This Court is in agreement with the reasoning of both the Ninth and Fourth Circuits on this issue. The cases cited by plaintiffs do not lead to a contrary result in that the issue at hand was addressed only in dicta, summarily and without any analysis.[3] We simply conclude that the rationale and result of the Fourth Circuit's opinion in Riley and the Ninth Circuit's opinion in Maher are more persuasive.[4] Accordingly, we find that OPRF did not violate the IDEA when it did not provide alternative services to John during his expulsion.
 
 IDEA "Stay-Put" Provision
 
 22
 The Does also argue that OPRF's refusal to stay John's special education placement during the pendency of his due process hearings violated the "stay-put" provision of the IDEA, 20 U.S.C. § 1415(e)(3)(A), which provides:
 
 
 23
 [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child....
 
 
 24
 The Does maintain that this issue is controlled by the Supreme Court's decision in Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686, discussed briefly above, a case that also involved the expulsion of special education students. But we disagree. In that case, a California school district, like OPRF, contended that it could expel a special education student for violent and disruptive conduct without retaining the child's placement in the public schools during the pendency of the due process hearing. While the Supreme Court stated that they would not read a "dangerousness" exception into the "stay-put" provision because the Court was "not at liberty to engraft onto the statute an exception Congress chose not to create," id. at 325, 108 S.Ct. at 605, there is one critical distinction between Honig and the case at hand: In Honig, the dispute grew "out of the efforts of certain officials of the [school district] to expel two emotionally disturbed children from school indefinitely for violent and disruptive conduct related to their disabilities." Id. at 312, 108 S.Ct. at 598 (emphasis added). Indeed, the Supreme Court stated the issue as "whether ... state or local school authorities may nevertheless unilaterally exclude disabled children from the classroom for dangerous or disruptive conduct growing out of their disabilities." Id. at 308, 108 S.Ct. at 596 (emphasis added). And in fact that very same distinction was recognized by the Ninth Circuit in the Honig case, when it specifically held that a disabled student could be expelled for misbehavior unrelated to his or her handicap. Doe v. Maher, 793 F.2d at 1482. The Supreme Court did not disturb that part of the Ninth Circuit's opinion in its opinion. The Supreme Court simply has not spoken directly on the issue at hand, viz., whether OPRF was required to stay John's placement in its high school when his infraction was found not to be a result of his learning disability.
 
 
 25
 OPRF argues that rather than apply the rigid approach of an automatic stay in a case like this, which would give a special education student with even a slight learning disability an avenue to delay expulsion indefinitely, decisions about whether students should be kept in school in this situation should be made on a case-by-case basis under the model suggested in Rodiriecus L. v. Waukegan School District No. 60, 90 F.3d 249 (7th Cir.1996). In Rodiriecus, the plaintiffs argued that the school district was prohibited from expelling Rodiriecus under the "stay-put" provision of the IDEA because he was in the process of being evaluated for special education purposes at the time of his expulsion. In response, this Court stated:
 
 
 26
 If the stay put provision is automatically applied to every student who files an application for special education, then an avenue will be open for disruptive, non-disabled students to forestall any attempts at routine discipline by simply requesting a disability evaluation and demanding to 'stay put,' thus disrupting the educational goals of an already overburdened and of [sic] times classified as a chaotic public school system.
 
 
 27
 Id. at 253. Instead, the Court looked to the four factors used in deciding whether to grant a preliminary injunction--likelihood of success on the merits, irreparableness of harm, weighing of harms, and the public interest--and held that the "stay-put" provision applies to a child who was not previously diagnosed as disabled only if school officials knew or reasonably should have known that the student was disabled. Id. at 254.
 
 
 28
 OPRF would have this Court find the reasoning in Rodiriecus equally applicable to this case, arguing that if we adopt the Does' position, then any student with a disability who was threatened with expulsion could avoid that expulsion for a lengthy period by filing a due process request under the IDEA, even if the misbehavior forming the basis of the expulsion was clearly unrelated to the student's disability. In a related argument, OPRF argues that this case falls within the confines of Rodiriecus because the Does are asserting that John's misbehavior related to an undiagnosed disability--ADHD. This argument has some appeal, but it is unnecessary to address it directly because the district court was correct that the "stay-put" provision of the IDEA is not implicated in a case like this, where the school district has made a reasoned determination following the procedures of the IDEA that a student's misbehavior is unrelated to his disability. Cf. Board of Education of Community High School District No. 218 v. Illinois State Board of Education, 103 F.3d 545, 548 (7th Cir.1996) (Discussing "stay-put" provision and stating that if "the behavior that triggered the expulsion could have been caused by the child's disability, [then] the procedural protections of the IDEA, rather than the disciplinary measures of the school, were warranted," suggesting that converse is true as well); Doe v. Maher, 793 F.2d at 1482. As discussed above, we conclude that the IDEA does not express an intent, either expressly or impliedly, to shield special education students from the normal consequences of their misconduct if that misconduct has nothing to do with their disabilities. "The [IDEA] was not designed to act as a shield to protect a disruptive child from routine and appropriate school discipline." Rodiriecus, 90 F.3d at 255.[5]
 
 
 29
 In this case, the MDC team charged with determining whether John's misbehavior related to his learning disability decided unanimously that it did not. (R. 81, Ex. 5; R. 80 at 3). As discussed below, they made that decision using procedures that did not violate the IDEA or John's due process rights. As a result, the "stay-put" provision of the IDEA was simply not implicated.
 
 III.
 
 30
 The Does also claim that OPRF did not comply with IDEA's due process requirements in connection with its decision to expel John. They argue that OPRF failed to comply with the IDEA in the following manner:
 
 
 31
 1. Plaintiffs were notified by letter dated September 13, 1994, of an MDC meeting set for September 16, 1994, and which was later moved to September 19, 1994. The notice did not say that termination of services or a change in John's placement would be discussed at the meeting. The Does argue that this notice did not give the ten-days' notice required by 23 Ill. Admin. Code tit. 23, § 226.520 (1996) and did not allow the Does to adequately prepare for the MDC meeting.
 
 
 32
 2. John was expelled within three days after the MDC. The Does argue that this violates § 226.590 and § 226.595 of Title 23 of the Illinois Administrative Code (1996), which required ten-days' notice prior to a change in educational placement or termination of special services.
 
 
 33
 Plaintiffs argue that as a result of the foregoing, they were prejudiced because John was expelled and they were not given a reasonable opportunity to obtain an independent evaluation in order to persuade OPRF that his misbehavior was related to his unevaluated ADHD. Therefore, they argue that the Level II hearing officer correctly found that OPRF had violated John's rights by giving them less than ten days prior to the MDC meeting in which they could obtain an independent evaluation.
 
 
 34
 OPRF argues, and the district court found, that the Does' claim that John had ADHD is unconvincing, and furthermore that such a condition, even if it existed, did not cause his misconduct. We agree with OPRF that the testimony of Dr. Meade and Ms. Fouks at the due process hearings is far from absolutely convincing in demonstrating that John had Attention Deficit Disorder ("ADD") or ADHD and that his misconduct was related to his disability. For example, Dr. Meade testified that John did not test positive for inhibitory control or impulse problems (R. 81, Ex. 3 at 246-247), and he also stated:
 
 
 35
 I think it's a toss-up right now how much of [John]'s inattention in the classroom would be due to avoidance behavior, that is the anxiety associated with not being able to perform well and trying to sort of distract himself and avoid the task of really getting down and working versus a primary ADHD process. So there is--it's six of one, half dozen of another with [John].
 
 
 36
 R. 62, Ex. 22 at 256-257. Even if John had ADD or ADHD, this Court notes the testimony of witnesses at the hearings disclosing that John had control of his conduct when he knew the rules (R. 81, Ex. 3 at 282) and other evidence that John knew that OPRF prohibited possession of marijuana at school functions (e.g., R. 44, Exs. A and D). We agree with the Level I hearing officer and the district court that John's decision to bring marijuana to a school dance appears to have been calculated, rather than impulsive. As a result of all of these factors, there was little likelihood that an ADHD evaluation would have affected the outcome of the MDC's determination that John's misconduct was unrelated to his disability. See, e.g., Doe v. Maher, 793 F.2d at 1480 n. 8 (a handicapped child's misconduct is related to his handicap "only if the handicap significantly impairs the child's behavioral controls").
 
 
 37
 We note the Ninth Circuit's following example in Doe v. Maher of a case where a handicapped child's misconduct would not trigger the protections of the IDEA:
 
 
 38
 An example of such attenuated conduct would be a case where a child's physical handicap results in his loss of self-esteem, and the child consciously misbehaves in order to gain attention, or win the approval, of his peers. Although such a scenario may be common among handicapped children, it is no less common among children suffering from low self-esteem for other, equally tragic reasons.
 
 
 39
 793 F.2d at 1480 n. 8. Like that example, in the present case both Dr. Meade's and Ms. Fouks' testimony very specifically stated that John's learning disability has resulted in his low self-esteem, which then results in John consciously misbehaving to gain the attention or win the approval of his peers. (R. 62, Ex. 2 at 189; R. 81, Ex. 3 at 280-281). We agree with the Ninth Circuit's conclusion that such attenuated conduct cannot trigger the protections of the IDEA. Therefore, while the amount of due process afforded the Does by OPRF was not excessive, the Does were not prejudiced by having less than ten days in which they could obtain an ADHD evaluation for John, and OPRF did not violate the IDEA in this regard.[6]
 
 IV.
 
 40
 The only other argument put forth by the Does that merits discussion is their claim that the district court erroneously granted summary judgment to OPRF on John's state and federal due process claims, because material issues of fact existed as to whether the process afforded to John in connection with his expulsion was meaningful. The plaintiffs assert that the district court improperly found that John's mitigation evidence was heard by the Board because a tape of the hearing was available for the Board. The Does argue instead that OPRF has admitted that only the "Summary of Evidence," the MDC report and the ARC report were submitted to the Board. As a result, the plaintiffs maintain that the district court's grant of summary judgment based upon this "erroneous" finding of fact should be reversed.
 
 
 41
 It is less than obvious that the Board was required as a matter of law to consider any mitigating factors. Nevertheless, after reviewing the "Summary of Evidence" prepared for the Board, we agree with the district court's conclusion that the basic outlines of the Does' defenses to expulsion were included in that document, even if not every part of their argument was presented in the Summary. For example, the Summary contains the following description of the Does' attorney's closing statement:
 
 
 42
 [The Does' attorney] said the parents understand the gravity of the situation and are not dismissing the offense as unimportant. They are respectful of the school's position and they need help in dealing with this situation. [John] is a young freshman at 13 years of age and is not up to task. She asks that the board take his special education LD status into consideration in reviewing his case. He is not a harm to others and no testimony was received that showed he tried to sell to others. There has only been an allegation of possession, and throughout the investigation he has been cooperative and respectful.
 
 
 43
 (R. 44, Ex. K at 6) (emphasis added). In addition, even if it is unclear whether the tape of the expulsion hearing was given to the Board for its decision-making, there is no evidence that the tape was not readily available if the Board wanted to listen to it.
 
 
 44
 Both parties to this action appear to agree that OPRF was required to provide some due process to the Does before expelling John, meaning due process that is more than a rubber stamp or sham. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 545-546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494. We conclude, after independently reviewing the record, that OPRF acted properly.
 
 V.
 
 45
 For the reasons discussed above, the decision of the district court is AFFIRMED.
 
 ADDENDUM
 June 23, 1997
 
 46
 On June 4, 1997, after this Opinion was issued, the President signed H.R. 5, which amended the "free appropriate public education" requirement of the IDEA to provide that a State eligible for funds under the IDEA must demonstrate that it has in effect policies that ensure:
 
 
 47
 A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.
 
 
 48
 H.R. § 612(a)(1)(emphasis added). There is no retroactivity clause in this legislation, and application of the amendment would have a truly retroactive effect--it would increase a party's liability for past conduct. Under these circumstances, and although this amendment in the future will undoubtedly lead to a result different from the one reached in the first section of Part II of this Opinion, we will not apply this amendment retroactively to our decision in this case. See Landgraf v. UST Film Products, 511 U.S. 244.
 
 
 49
 On June 10, 1997, appellants filed a petition for rehearing with suggestion for rehearing en banc. All of the judges on the panel have voted to deny rehearing and no judge in active service has requested a vote on the suggestion for rehearing en banc. Accordingly,
 
 
 50
 IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.
 
 
 
 [1]
 The plaintiffs have also filed a Motion to Vacate Decision for Want of Jurisdiction, basing that motion on the fact that the full administrative record was not filed with the district court. They argue that such filing was required by 105 Ill. Comp. Stat. 5/14-8.02(k) (West 1997) and § 1415(e)(2) of the IDEA. As a result, the Does argue that the district court should have dismissed OPRF's counterclaim because the defendant failed to serve the Illinois State Board of Education ("ISBE") within one year of filing its counterclaim. They contend that, because ISBE is the official custodian of the administrative record in this case, service upon it was necessary, but it was not made a party within the 120 days required under F.R.C.P. 4(m)
 It is not necessary to vacate the district court's decision, because the court had before it all portions of the administrative record necessary to make a decision on the parties' cross-motions for summary judgment. The Does have not argued to this Court that John was denied an opportunity to present any relevant evidence to the district court, and we find their conclusory assertions that they were prejudiced by incompleteness in the record unpersuasive.
 Moreover, the absence of ISBE in this action mandates dismissal only if ISBE is an indispensable party, which it is not. See F.R.C.P. 19(b). Indispensability is an equitable, not a jurisdictional, doctrine. See Landau & Cleary, Ltd. v. Hribar Trucking, Inc., 867 F.2d 996, 997 n. 1 (7th Cir.1989); Graf v. Elgin, Joliet and Eastern Railway Co., 697 F.2d 771, 775 (7th Cir.1983). For all these reasons, this Court will not vacate the decision.
 
 
 [2]
 The Does also point to the Illinois Administrative Code for support for the argument that OPRF was required to provide alternative educational services to John. Section 226.595 of Title 23 of the Illinois Administrative Code (1996) provides that a special education student's educational services may be terminated only following a conference at which it is concluded that "such placement is no longer required, and that termination of the placement is in the best interests of the child, or that the child was inappropriately placed." The Does say that there was no such determination made for John, so that his services were illegally terminated in violation of the Illinois Administrative Code
 We were unable to find any Illinois court decisions construing this provision, but it appears to speak only to the complete termination of special education services, rather than a temporary suspension of the services being provided. (In fact, it is titled "Termination of Special Education Services.") In the case at hand, John's return to school and to his special education services there were never in question. More importantly, we find the reasoning in our discussion above--concluding that the IDEA does not require OPRF to continue to provide alternative educational services to John after his misbehavior has been found to be unrelated to his disability--is also persuasive on this point. Once a student's misbehavior has been found to be unrelated to his or her disability, there is no justification for treating him or her differently from the non-disabled child. Under those circumstances, the conference described in § 226.595 is not required.
 
 
 [3]
 For example, the Fifth Circuit in S-1 v. Turlington, 635 F.2d at 348, concluded in dicta only that:
 expulsion is still a proper disciplinary tool under the [IDEA] and section 504 [of the Rehabilitation Act of 1973] when proper procedures are utilized and under proper circumstances. We cannot, however, authorize the complete cessation of educational services during an expulsion period.
 Kaelin v. Grubbs, 682 F.2d at 600, 602 and Board of Education of the City of Peoria v. Illinois State Board of Education, 531 F.Supp. at 151, supra merely cite and repeat Turlington's conclusory dicta. We find none of these opinions persuasive, because they contain no thoughtful discussion regarding the relationship of the expelled student's misbehavior to his or her disability in connection with the conclusion that educational services must be maintained. In addition, the opinions contain no discussion regarding whether cessation of special education services may be proper under some circumstances.
 
 
 [4]
 We are not persuaded by the Does' argument that the Improving America's Schools Act of 1994, Pub.L. 103-382, 108 Stat. 3518 (enacted October 20, 1994), which inter alia amended the IDEA's "stay-put" provision, has any bearing on the issue at hand. Section 314 of that Act amends the "stay-put" provision to provide that a student with a disability who brings a weapon to school, and thus who is subject to the one-year automatic suspension requirement of the Gun-Free Schools Act of 1994, 20 U.S.C. § 8921, may be placed in an interim alternative educational setting for up to 45 days, at school district expense. The Does appear to argue that if Congress chose not to provide for automatic termination of services even when a weapon is involved, then they could not have meant that services can be terminated by a school district when the misbehavior is less serious
 The Does' argument is weak for several reasons. First, the language of the statute is that the school district "may" continue to provide services; no one is arguing in this case that the school district cannot choose to pay for alternative special education services when students are expelled for misbehavior unrelated to their disability. Second, and more importantly, the Act's amendment of the "stay-put" provision simply does not appear to this Court to bear on the issue we discuss in the next section of this opinion: whether the "stay-put" provision applies at all in the case where a student's misbehavior is unrelated to his disability. Finally, the relevant section of the Act also directs that nothing in the IDEA should supersede the Gun-Free Schools Act with respect to children whose misconduct is unrelated to their disabilities, which suggests that Congress recognized that under the IDEA a student who brings a gun to school for reasons totally unrelated to his disability otherwise may be treated differently than one whose conduct is related to his disability.
 
 
 [5]
 The same reasoning disposes of another of the Does' arguments: that the Level II hearing officer appropriately found that OPRF violated the law when it refused to re-evaluate John prior to his expulsion. In that regard, they direct our attention to 34 C.F.R. 104.35, which was enacted pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"). That regulation requires a school to conduct a pre-placement evaluation whenever there is any "subsequent significant change in placement" for a special education student. 34 C.F.R. 104.35(a). The Does argue that because the Supreme Court held in Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686, that expulsion constitutes a significant change in placement, John's proposed expulsion should have triggered an evaluation pursuant to both Section 504 of the Rehabilitation Act and the IDEA. They claim that OPRF's September 19, 1994 MDC placement decision violated these requirements because "OPRF failed to provide current evaluative data, failed to evaluate for ADHD despite its own psychologist's suggestion and parents' request and failed to include on the MDC team any persons knowledgeable about John Doe." (Appellants' Brief p. 43) (emphasis in original). The Does also claim that the IDEA required OPRF to consider the educational impact of each placement decision, in this case the expulsion, and the MDC team failed to do so
 We will not repeat our reasoning in the first two sections of this opinion, but that reasoning is equally applicable to these assertions. There was no violation of the IDEA or the Rehabilitation Act in connection with John's expulsion, because the MDC properly determined that his misconduct was not related to his learning disability. Neither the IDEA nor the Rehabilitation Act should be read to protect John from the consequences of such misconduct.
 
 
 [6]
 The Does' argument that the Level II hearing officer correctly found that John's original inappropriate placement was a violation of the Does' rights is easily disposed of, in that it was Mrs. Doe who made the decision to stop resource services and to enroll John in biology class
 The Does also claim that OPRF did not appropriately prepare for John's return to the public school setting, noting the Level II hearing officer's findings that no steps were taken by OPRF to convene a staffing to plan for John's return and that it was only at the Does' request that OPRF convened an MDC to consider John's independent evaluation and design an appropriate Individualized Education Plan ("IEP"). The Does maintain that OPRF "indisputably" was not prepared to properly place John for the spring term following his expulsion. They assert that the Level II hearing officer's conclusion in that regard was fully supported in the record and was relevant to his holding that John's continued private placement was appropriate (i.e., reimbursable by OPRF). However, as noted by the district court, at the Level II hearing Mr. Doe admitted that he received a letter from OPRF dated November 8, 1994, stating that OPRF was willing to conduct a re-evaluation and to proceed to complete testing so that a staffing could be scheduled for John's return. (R. 81, Ex. 7 at 78-80; R.100 at 16). The Does' failure to make a request for an MDC following that letter until January 25, 1995 (an MDC was convened one month later) does not support the conclusion that John's placement at a private school during the Spring 1995 semester should be reimbursed by OPRF.