**Jonathan COLVIN, By and Through His Parents and Next Friends, Scott and Lisa COLVIN, and Scott and Lisa Colvin, Individually Plaintiffs,**

v.

**LOWNDES COUNTY, MISSISSIPPI SCHOOL DISTRICT, Defendant.**

**No. CIV.A.1:99CV306–D–D.**

United States District Court, N.D. Mississippi, Eastern Division.

Oct. 6, 1999.

Joseph N. Studdard, Studdard Ray & Ford, Columbus, MS, for Plaintiffs.

James A. Keith, Adams and Reese, Jackson, MS, for Defendant.

## OPINION

DAVIDSON, District Judge.

Before the court is the motion of the Plaintiffs for preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. Having heard testimony and oral arguments and received exhibits in this matter and upon due consideration, the court is of the opinion that the

Plaintiffs have alleged a violation of the Individuals with Disabilities in Education Act, and that the Defendant did not accord the Plaintiff, Jonathan Colvin, with his full due process guarantees. By agreement of the parties and pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the court advanced and consolidated the trial of this action on the merits with the application hearing. Accordingly, the following memorandum opinion contains the court's findings of fact and conclusions of law and shall serve as the final judgment in this case. FED. R. CIV. P. 52(a).

The instant case requires this court to address the timely and often controversial topic of school district zero-tolerance policies. In response to numerous instances of school-related crime and violence, several states have implemented laws and countless school districts across the nation have established stringent policies regarding the presence of weapons and drugs on school premises.[1] These "zero-tolerance" policies provide for immediate suspension or expulsion of students that possess weapons or drugs on school grounds. In general, a student found carrying a weapon, such as a gun or a knife, on school property is given no second chance, no appeal, and no guarantee of alternative school programs or education.

The devastation school violence can reap is nowhere more apparent than in the State of Mississippi.[2] While this court is cognizant of the unenviable position of the school boards of this and other states and of their aim to create a school environment conducive to learning, by eliminating the fear of crime and violence, such efforts must be balanced with the constitutional guarantees afforded to the children that enter the school house door.

> Education is perhaps the most important function of state and local governments . . . . [I]t is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment . . . . [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

## I. FINDINGS OF FACT

During the 1998–99 school year, Jonathan Colvin was a sixth grade student at New Hope Middle School in New Hope, Mississippi. During this school year, as with many before, Jonathan was struggling to avoid academic failure. Jonathan's parents, Lisa and Scott Colvin, first noticed Jonathan's scholastic difficulties after he entered the first grade. After years of battling to improve Jonathan's grades, the Colvins concluded that he was suffering from learning disabilities/handicaps, specifically either ADD (Attention Deficit Disorder) or ADHD (Attention Deficit Hyperactivity Disorder), which was frustrating his efforts to learn in a mainstream classroom setting. While Jonathan was able to complete first through third grades, his parents decided that he should repeat the fourth grade in order to give him an opportunity to mature and obtain a better grasp of the material. Although this action proved beneficial for Jonathan's second term in the fourth grade, during

---

1. Congress has also taken a firm position in attempting to prevent school-related violence. The Gun Free Schools Act of 1994 requires public school districts to expel students found with weapons on school grounds for at least one academic year, or risk losing federal educational funds under the Elementary and Secondary Education Act. Since passage of the Gun Free Schools Act, several states have adopted zero-tolerance policies to assure conformity with federal funding requirements. Paul M. Bogos, Note, *Expelled. No Excuses.*

*No Exceptions.—Michigan's Zero–Tolerance Policy in Response to School Violence: M.C.L.A. Section 380.1311,* 74 U. Det. Mercy L.Rev. 357, 358 (1997).

2. On October 1, 1997, two students were killed and seven wounded after sixteen year-old Luke Woodham opened fire at Pearl High School in Pearl, Mississippi, after beating and stabbing his mother to death earlier that morning.

his fifth grade year and for the first half of the 1998–99 school year, he was scarcely treading water.

On the morning of February 25, 1999, Jonathan was found to be in possession, on school premises, of a weapon, specifically, a miniature Swiss-army type knife.[3] The facts regarding the discovery and presence of the knife are not substantially in dispute. On the day of the incident, Jonathan carried his books and supplies to school in a traditional-style book bag. In preparation for his morning English class, Jonathan reached into his bag to retrieve his textbook. While removing the book, the knife fell to the floor, apparently through a hole in his book bag. Jonathan immediately picked up the knife and placed it in his pocket to avoid losing it. A fellow student observed these events and reported to their teacher that Jonathan had a knife on his person. When confronted, Jonathan admitted having the knife, stated that he was not aware that he had brought it to school, that it apparently fell into his book bag by accident, and handed the knife over to his teacher without incident. Jonathan made no threatening gestures with the knife and fully cooperated with his teacher and the school officials after its discovery.

Following the discovery of the knife, Jonathan's English teacher prepared a discipline referral form which was sent to Assistant Principal Rob Calcote indicating that Jonathan was found in possession of a weapon. Upon questioning by the Assistant Principal, Jonathan admitted having the knife and was subsequently suspended for nine days with a recommendation for expulsion.[4] By letter dated March 9, 1999, the Plaintiffs were notified that a disciplinary hearing had been scheduled for March 15 1999, and informed of their right to attend, to bring witnesses and/or affidavits, or to have counsel of their choosing present.

On March 15, 1999, Jonathan and his father attended the disciplinary hearing, presided over by Hearing Officer Gary S. Goodwin. Also present at the hearing were Assistant Principal Rob Calcote and Bob Eiland, Principal of New Hope Middle School. Upon review of the testimony and evidence presented, Officer Goodwin prepared a written recommendation for the Lowndes County Board of Education. Officer Goodwin's recommendation contained numerous findings, including the following:

1) Jonathan Colvin, 12 years of age, in 6th grade, is not receiving special education services and is questionably handicapped with Attention Deficit Hyperactivity Disorder.

2) Assistant Principal Rob Calcote testified that Jonathan is a model student, has never had any problem with the school, and his parents have been very interested and involved in his academic progress.

3) Both Rob Calcote and Principal Bob Eiland urge leniency in this matter.

4) The alleged knife in question appears to be nothing more than a Swiss army utensil which has a pair of scissors, a closed-end (not sharpened) cuticle knife, and a fingernail file.

5) Jonathan knew the quality and character of the object in his possession and

---

3. The "weapon" in question is a miniature Swiss-army knife key chain approximately two inches in length containing a fingernail file, small pair of scissors, and closed-end cuticle knife. The item bears the insignia of a medical or pharmaceutical company and was given to Jonathan by his mother, a registered nurse. The pleadings and proof at trial also revealed that the student possessed what the School District referred to as a "modified home-made razor blade." This object appears to be a ¾ inch blade from a hand-held pencil sharpener. Based on certain documentary evidence presented at trial, it appears that only possession of the knife prompted the student's expulsion. Nothing in the record before the court suggests that the sharpener blade was a basis for punishment.

4. The Suspension Report prepared by New Hope Middle School notes that Rule 12 of the Secondary Handbook indicates that a student will be recommended for expulsion for possession of a dangerous instrument. Joint Exs. 2, 5.

was therefore in violation of Mississippi Code Annotated § 37–11–18.

6) Jonathan is not eligible for the alternative school program for compulsory age students as provided in Mississippi Code Annotated § 37–13–92.

Joint Ex. 8. Based on these findings, Officer Goodwin made the following recommendation to the Board of Education:

It is the opinion of the hearing officer that this student should be expelled from the Lowndes County Schools for a period of one (1) year, with the period of expulsion to be modified, however, by suspending imposition of the expulsion for the school year, except for a period of one (1) day, and that upon return of the student after that day, the student and his parents be made aware that any other violation of the school's rules and regulations will result in imposition of the remainder of the expulsion period.

Joint Ex. 8.

On April 5, 1999, the Lowndes County School Board overruled the Hearing Officer's recommendation and approved expulsion of Jonathan from the Lowndes County School System for a period of one calendar year.[5]

Prior to the above incident, Jonathan had one disciplinary infraction in his record. Three days before the incident at issue, Jonathan failed to appear for a thirty-minute after school detention and as a consequence, received corporal punishment. Notably, Jonathan received the detention for failing to complete a homework assignment. Numerous school officials and teachers provided testimony regarding Jonathan's attitude and demeanor. Each witness, without fail, testified that Jonathan was a pleasant and respectful student, displaying no aggressive tendencies and posing no disciplinary problems.

**5.** Although the minutes of the School Board meeting reflect that the Board accepted the Hearing Officer's recommendation, the actual vote was one for expulsion.

**6.** The Act defines children with disabilities as: children with mental retardation, hearing impairments including deafness, speech or

## II. CONCLUSIONS OF LAW

The Plaintiffs have alleged claims under two primary theories: 1) the Individuals with Disabilities in Education Act, and 2) the Due Process Clause of the Fourteenth Amendment. The court will address these issues in turn.

### A. *Individuals with Disabilities in Education Act*

The Plaintiffs contend that Jonathan was expelled from New Hope Middle School despite his being a child with a disability as that term is defined under the Individuals with Disabilities in Education Act (IDEA), and in violation of the Act's "stay-put" provision.[6]

Congress passed the IDEA to "assure that all children with disabilities have available to them ... a free appropriate public education." 20 U.S.C. § 1400(c). The Act requires states, in order to qualify for certain financial assistance, to assure that children residing in the state who are disabled, regardless of the severity of their disabling condition, and "who are in need of special education and related services are identified, located, and evaluated." 20 U.S.C. § 1415(b)(1)(C); *see Rodiriecus L. v. Waukegan Sch. Dist. No. 60*, 90 F.3d 249, 251–52 (7th Cir.1996). As well as providing substantive rights for the education of children with disabilities, the Act also mandates that state educational agencies establish and maintain procedures to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies. 20 U.S.C. § 1415(a).

Significantly, the Act mandates that during the pendency of administrative or dis-

language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities. 20 U.S.C. § 1401(a)(1)(A)(i).

ciplinary proceedings, the disabled child is to remain in his or her then current educational program. This requirement, referred to as the "stay-put" provision, provides:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child.

20 U.S.C. § 1415(e)(3)(A). This provision serves to give the child's parents "the choice of keeping the child in his existing program until their dispute with the school authorities is resolved." *Board of Educ. of Oak Park v. Illinois State Bd. of Educ.*, 79 F.3d 654, 659–60 (7th Cir.1996).

■ Prior to the February disciplinary infraction, Jonathan had not been identified as a child with a disability under the IDEA. It has been established, however, that a student who has not been determined to be eligible for special education services and who has engaged in behavior that violated any rule or code of conduct of the school district, may assert any of the protections provided under the IDEA regarding discipline and removal from the educational program, if the school district knew of, or should have known of, the student's genuine disability. *Rodiriecus*, 90 F.3d at 254. Thus, the burden falls upon the plaintiff to "reasonably demonstrate" that the school officials knew of, or should have known of the student's disability. *See id.*

■ Invoking the stay-put provision of the IDEA, however, requires more. Not only must the plaintiff establish that the school district knew of or should have known of the student's genuine disability, but also that the misconduct was related to such disability. "When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children." *Doe v. Board of Ed. of Oak Park & River Forest High School*

*Dist. 200*, 115 F.3d 1273, 1278 (7th Cir.1997)(quoting *Doe v. Maher*, 793 F.2d 1470, 1482 (9th Cir.1986)), *aff'd as modified sub nom.*, *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Congress expressed no intent, either expressly or impliedly, to shield special education students from the normal consequences of their misconduct if that misconduct has nothing to do with their disability. *Doe*, 115 F.3d at 1280. Thus, absent such a connection, the IDEA stay-put provision is not implicated.

■ Based on the record evidence presented, the court is of the opinion that the Plaintiffs have failed to carry their burden of establishing that Jonathan is a child with a disability, and furthermore that such a disabling condition, even if it existed, contributed to his misconduct. Numerous lay witnesses provided their opinion of Jonathan's abilities, most admitting their lack of qualification to make an assessment of whether he suffers from ADD or ADHD. Although several others, including Jonathan's parents, made reference to medical diagnoses and tests that were administered which concluded that he suffered from ADD/ADHD no proof was forthcoming. And, while the Plaintiffs contend that Jonathan suffers from a disability of which the School District was aware, there has been no allegation that his disciplinary infraction related in any way to his alleged disability. Nothing in the record suggests that Jonathan did not have control of his conduct when he brought the knife or that he did not comprehend the School District's disciplinary rules. Thus, even if the court were to assume that Jonathan suffers from a disabling condition which the School District knew of or should have known of, the stay-put provision is irrelevant unless his behavior was related to the disability. *See Doe*, 115 F.3d at 1282 ("[T]here is little likelihood that an ADHD evaluation would have affected the outcome of the [school's] determination that [the] misconduct was unrelated to his disability."). Accordingly,

the court concludes that the Plaintiffs have failed to establish that Jonathan is subject to the IDEA's stay-put provision.

■ Notwithstanding this finding, the court is of the opinion that the Colvins did make requests to School District personnel to have Jonathan evaluated for learning disabilities and that the District violated the IDEA by failing to provide some testing procedure to determine whether Jonathan was a child with a disability.

Under the Act, states have an affirmative duty to locate and identify children who might be disabled. 20 U.S.C. § 1415(b)(1)(C). The IDEA specifically requires that state and local educational authorities implement procedures for the identification, evaluation, and placement of disabled students. *See id.* "The first responsibility of an educational authority is to locate and identify children who might be disabled in some way." *Clay T. v. Walton County Sch. Dist.,* 952 F.Supp. 817, 822 (M.D.Ga.1997). The identification of children who have disabilities should be a cooperative and consultative process between school administration and parents. *Pasatiempo v. Aizawa,* 103 F.3d 796, 802 (9th Cir.1996). Congress' emphasis upon joint decision-making suggests that when a parent suspects his or her child is disabled and requests an evaluation, that suspicion should be sufficient to place any subsequent action or inaction taken with respect to that request within the ambit of the IDEA. *Id.* at 803 ("The informed suspicions of parents, who may have consulted outside experts, should trigger the statutory protections [of the IDEA].").

In 1992, Lisa Colvin completed an application for Jonathan to attend New Hope Middle School wherein she stated that Jonathan had been diagnosed with ADD and was taking the prescription medication Ritalin. On the application, Ms. Colvin included a request that the school advise her of any problems relating to Jonathan's condition or to the Ritalin. *See* Joint Ex. 22. The court heard testimony from Jonathan's former teachers as well as those teaching him during the 1998–99 school year, describing the difficulties Jonathan had with every day, routine assignments, his inability to concentrate or "stay on task," his below average academic performance, low scholastic test scores [7], and inability to perform in certain subjects at his current grade level. Notably, in September 1998, at the request of the Colvins, Jonathan's teachers and Assistant Principle Calcote met with the Colvins to discuss Jonathan's academic problems. Although it was early in the school year, Jonathan was already falling behind and his mother was particularly concerned about the effectiveness of his time spent in the classroom.[8] The Colvins contend that it was at this meeting that they spoke with Assistant Principle Calcote about having Jonathan tested for ADD or ADHD. Calcote purportedly referred the Colvins to a professional in Starkville, Mississippi, to assist with having Jonathan evaluated, but Calcote made no offer to institute any evaluation procedures within the School District. While the question of whether the Colvins actually requested an evaluation has been vehemently contested, the court finds there is sufficient evidence in the record to

7. During his fourth-grade year, Jonathan was administered the Iowa Tests of Basic Skills, a standardized achievement test. Jonathan's test results, which are noted to be the best indicator of his standing in overall achievement, placed him in the 8th percentile rank of fourth grade students nationally, i.e., 92% of test takers scored as well or higher than Jonathan. *See* Joint Ex. 17.

8. Although Jonathan was failing one subject and passing another subject by a mere one point, some teachers professed this a success and did not consider such standing to warrant consideration. The court finds such an attitude repugnant. When the educators of this State allow the measure of success to be one point above failure, it follows that the intellectual pursuits and vocational aspirations of their students will suffer. Mississippi is routinely regarded as having among the lowest educational statistics in the nation, lowering the standard for achievement serves only to sabotage the efforts of those working to overcome this obstacle.

substantiate the Plaintiffs' claim that they did request testing for Jonathan.

The court finds particularly compelling the tape recorded testimony of Scott Colvin and Rob Calcote at the March 15, 1999 expulsion hearing. When asked by Hearing Officer Goodwin whether Jonathan suffered from a disability, Calcote indicated that according to Jonathan's cumulative file he had been tested by a board certified psychologist. Ex. P–4. Scott Colvin then indicated that several requests had been made to have Jonathan tested and that they had been refused or disregarded. Ex. P–4. Because these statements were made before Jonathan was expelled and well before institution of the instant case, the court finds the testimony highly probative.

In addition to the above, it appears that Jonathan's academic performance caught the attention of several of his teachers. Several tactics were employed by his teachers, with his parents' participation, to assist with Jonathan's faltering performance, including: assigning peer tutors to assist him with his in-class assignments, providing written homework assignments for his parents to review and track Jonathan's work, and finally, shortly before Jonathan's expulsion, one of his teachers began an "instructional intervention" which was to include an evaluation by each teacher of Jonathan's abilities for referral to special education. This was not completed prior to Jonathan's expulsion.

The court is of the opinion that the School District overlooked the Colvins' requests as well as Jonathan's academic performance in violation of the IDEA. Whether Jonathan is suffering from a learning disability or an emotional disturbance, this court cannot determine. It is clear, however, that Jonathan was contending with some type of problem. At a minimum, the School District should have provided testing to ascertain whether it was a learning disability. If and when the student is reinstated, the court is of the opinion that he should be formally tested to determine whether he is suffering from a learning disability, in accordance with the IDEA.

## B. Constitutionality of the School Board Action

The Plaintiffs also allege that the School District's action violated Jonathan's constitutional due process rights. For the reasons stated below, this court agrees.

Entitlement to a public education has long been recognized as a property interest protected by the Due Process Clause of the Fourteenth Amendment to the Constitution. *Goss v. Lopez,* 419 U.S. 565, 573–75, 95 S.Ct. 729, 735–37, 42 L.Ed.2d 725 (1975). In accordance with this principle, certain procedural safeguards are established by public schools in order to ensure that the due process rights of its students are not violated.

> [While] it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion ... [p]ublic ... school students do have substantive and procedural rights while at school.

*Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). Although school boards have substantial disciplinary authority, that authority is legal in its derivation and its exercise is subject ultimately to the Constitution of the United States:

> The Fourteenth Amendment, as now applied to the states, protects the citizens against the state itself and all of its creatures—boards of education not excepted. These have important, delicate, and highly discretionary functions but none that they may not perform within the limits of the Bill of Rights.

*West Virginia State Bd. of Educ., v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). The authority vested in school boards consistent with this constitutional limitation includes substantial discretion with respect to the administration of punishments to students who violate school rules. *Clinton Mun. Sepa-*

*rate Sch. Dist. v. Byrd,* 477 So.2d 237, 240–41 (Miss.1985). Thus, this court will not interfere with school boards in the exercise of such discretion so long as constitutional parameters are not transgressed. *Id.* at 241.

■ In assessing the constitutional parameters of the case *sub judice,* the court finds compelling the reasoning of the Fifth Circuit decision in *Lee v. Macon County Board of Education,* 490 F.2d 458 (5th Cir.1974). In *Lee,* the court vacated the district court decision affirming the permanent expulsion of two high school students and remanded the case to the district court with instructions to remand to the school board for reconsideration. While the students were afforded a hearing before the school board, the court found that the board, in making its disciplinary decision, merely employed a formalistic acceptance or ratification of the school principal's recommendation, absent any independent assessment of what penalty to impose. The court specifically held that the school board employed "an erroneous legal standard in considering the children's cases," and directed that when a serious penalty is at stake a school board must provide a higher degree of due process than when a student is threatened only with a minor sanction. *Id.* at 459. The opinion is worth quoting:

> Formalistic acceptance or ratification of the principal's request or recommendation as to the scope of punishment, without independent Board consideration of what, under all the circumstances, the penalty should be, is less than full due process. Appropriate punishment is for the Board to determine, in the exercise of its independent judgment.

*Id.* at 460 (footnote omitted).

While in the instant case, the Board did not defer to the judgment of another offi-cial, it did defer to an unwritten blanket policy of expulsion, absent reference to the circumstances of the infraction. It appears clear that the aim of the Fifth Circuit's decision, was to require school boards to fully consider the circumstances surrounding the misdeed as well as the penalty to be prescribed in an effort to provide students with full due process. Employing a blanket policy of expulsion, clearly a serious penalty, precludes the use of independent consideration of relevant facts and circumstances. Certainly, an offense may warrant expulsion, but such punishment should only be handed down upon the Board's independent determination that the facts and circumstances meet the requirements for instituting such judgment. By casting too wide a net, school boards will effectively snare the unwary student.

> The school board may choose not to exercise its power of leniency. In doing so, however, it may not hide behind the notion that the law prohibits leniency for there is no such law. Individualized punishment by reference to all relevant facts and circumstances regarding the offense and the offender is a hallmark of our criminal justice system.

*Byrd,* 477 So.2d at 241. In a system where criminal offenders are afforded individualized punishment upon review of the facts and circumstances regarding the offense, students in our public school systems, who may also face a daunting punishment, should at least be afforded a thorough review of their case, prior to imposition of penalty.[9]

Initially, the court notes that nothing in the District's written Handbook acknowledges the Board's zero-tolerance policy, although the Board was utilizing the policy

---

9. Although the School District relies in part on *Mitchell v. Board of Trustees of Oxford Municipal Separate School District,* 625 F.2d 660 (5th Cir.1980), the court is of the opinion that the decision is distinguishable. In *Mitchell,* the court addressed whether a school board should use discretion to tailor punish-ment to the student. Here, the court does not seek to require the School Board to employ a discretionary approach in assessing the punishment for the student, rather that the facts and circumstances of the student's case be given full, independent consideration prior to invoking punishment.

by voice vote at its meetings. The Secondary Handbook provides:

> If the Board of Education finds the student guilty of some or all of the charges made against him/her, the school record and previous conduct of the student will be taken into consideration in determining the discipline administered to the student.

Joint Ex. 11, p. 30. Despite the plain language of the Handbook, the President of the Lowndes County School Board testified that the District's zero-tolerance policy requires that the Board impose the same penalty regardless of the circumstances surrounding the offense: a one year expulsion for a weapon or drug infraction.[10] When specifically asked whether the Board considered Jonathan's school record and previous conduct in determining the discipline to be administered, the President of the School Board testified that they did not.

Although the Superintendent of Schools stated that the Board reviews each case on the merits, the President of the School Board testified that he had not seen or reviewed the weapon Jonathan was found in possession of until the trial of this matter. To be sure, the court is not offended by the School Board's decision to overrule the Hearing Officer's recommendation, clearly it had the authority to do so. The court is, however, offended by the manner in which it blindly meted out the student's punishment. Here, Jonathan was expelled for a calendar year, a penalty that this court considers serious and worthy of a higher degree of due process. Nothing in the record reflects independent consideration by the Board of the relevant facts and circumstances surrounding Jonathan's case. According to the minutes of the School Board hearing, the Board acted upon and adopted the recommendation of the Hearing Officer to *expel* Jonathan for one calendar year. Joint Ex. 10. The Officer's recommendation, however was not for expulsion. This provides added concern as to what the Board had knowledge of or thought it was doing when it invoked the expulsion. It appears that the Board simply knew that a weapon was found on school property and instituted a blanket penalty, absent review of relevant facts or circumstances.

While this court if fully aware that school disciplinary matters are best resolved in the local community and within the institutional framework of the school system, the court is of the opinion that the Board employed an erroneous standard in considering Jonathan's case. Based on the guiding principles of the Fifth Circuit's decision in *Lee,* the court concludes that the case must be remanded to the Board with directions that it reconsider the question of appropriate penalty, under correct legal standards. Nothing in this court's opinion should be construed to limit the authority of the School Board to enforce its rules and regulations or to enforce its zero-tolerance policy, provided, however, that the correct legal standard is applied and that the student's due process rights are recognized.

A separate order in accordance with this opinion shall issue this day.

---

10. The School District weapons policy is derived from Mississippi Code Annotated section 37–11–18, which provides:

> Any student in any school who possesses any controlled substance . . . , a knife, handgun, other firearm or any other instrument considered to be dangerous and capable of causing bodily harm or who commits a violent act on educational property. . . shall be subject to automatic expulsion for a calendar year . . . ; provided, however, that the superintendent of the school shall be authorized to modify the period of time for such expulsion on a case by case basis.

MISS. CODE ANN. § 37–11–18 (1999).