GRAVES, Justice,
Dissenting.
¶ 46. The majority’s decision to affirm the Hinds County School Board’s decision to expel R.B. substantially erodes the due process rights of Mississippi public school students. The record does not support a finding that R.B. was expelled from Byram Middle School on the basis of substantial evidence. Neither does the evidence support a finding that he was afforded due process when expelled from the Hinds County School District. Therefore, I respectfully dissent.
I.
¶ 47. The majority finds that the Hinds County School Board properly expelled R.B., then a twelve-year-old in the sixth grade, for allegedly possessing a weapon. When school officials find that a student has comiiiitted misconduct and should be expelled, the student has the right to appeal the school’s decision to a three-member Appeals Committee panel. If the Appeals Committee upholds the decision to expel the student for thirty days or more, then the School Board reviews the case and makes a final determination. When reviewing such cases, the School Board sits as a factfinder. Jones v. Bd. of Trs., 524 So.2d 968, 973 (Miss.1988); T.B. ex rel. C.B. v. Bd. of Trs., 931 So.2d 634, 638 (Miss.Ct.App.2006).
¶ 48. In this case, after R.B. and D.L.B. challenged R.B.’s expulsion from Byram Middle School, the School Board[10] upheld the decision to expel R.B. and send him to Main Street Alternative School for the remainder of the 2003-04 school year and the beginning of the 2004-05 school year. The School Board also placed R.B. on probation for the 2004-05 school year. The majority holds that there was substantial evidence justifying R.B.’s expulsion for possessing a weapon.
¶ 49. The majority does not mention that the device — the alleged weapon — belonged to R.B.’s mother and was part of a nail manicure set. The testimony revealed that R.B. and his mother had similar backpacks, and when R.B.’s backpack strap broke, his mother simply transferred R.B.’s books and belongings into her backpack, which, as they later realized, still contained the device in question. R.B. then brought his belongings to school in his mother’s backpack.
¶ 50. The device was never viewed or inspected by the Appeals Committee before it upheld the decision to suspend R.B. When reviewing the Appeals Committee’s decision, the School Board also did not view the device to determine whether or not it was a weapon. Although contraband such as illegal substances or weapons such as firearms possessed by students may be unavailable for viewing in some cases of student misconduct, this device *405 remained in the control of the school. The School Board provides no explanation as to why the device could not have been examined by either the Appeals Committee or the School Board. Moreover, the nature of the device itself was — -and is still — vigorously contested. The fact that the school district, the student, the chancery court, the Court of Appeals, and now this Court cannot agree on the nature of the device is an indication of how important it was for the Appeals Committee and School Board to have examined the object in the first place. A proper inspection of the object was integral to the Appeals Committee’s and School Board’s decisions as to whether or not R.B. should be expelled. The District Court for the Northern District of Mississippi has stated that “[i]n a system where criminal offenders are afforded individualized punishment upon review of the facts and circumstances regarding the offense, students in our public school systems, who may also face a daunting punishment, should at least be afforded a thorough review of their case, prior to imposition of penalty.” Colvin ex rel. Colvin v. Lowndes County, 114 F.Supp.2d 504, 512 (N.D.Miss.1999) (emphasis added). Certainly, in this case, a thorough review by the Appeals Committee and School Board should have included an inspection of the alleged weapon.
¶ 51. But the Appeals Committee merely relied on the reports of Principal Campbell and a school resource officer, both of whom described the device as a pocket knife. The School Board, in turn, relied on the Appeals Committee’s findings and the superintendent’s opinion regarding the nature of the device. The Court of Appeals plurality concluded that due process was violated when the School Board delegated the authority to classify the device to the superintendent. R.B., 10 So.3d at 509-12. The School Board has a duty, as a factfinder, to make certain factual determinations. See Jones, 524 So.2d at 973. Although superintendents have the statutory authority to suspend or expel students in the first instance, the superintendent’s judgment cannot be substituted for that of the School Board when it reviews a decision to punish a student. Miss.Code Ann. § 37-7-301(e) (Rev.2007).
¶ 52. It should be noted that the superintendent never saw the device either. She determined that the device was a weapon based on her review of a blurry photocopy of part of the device. The photocopy depicts the device with only one of the three prongs extended. Also, the size of the device portrayed in the photocopy is slightly larger than the device itself. The record includes a second photocopy, in which the size of the device is significantly larger than its actual size. It is not clear whether the School Board viewed either photocopy. Either way, it had already wrongfully abdicated its factfinding duties by relying on the superintendent’s classification of the device.
¶ 53. The majority adopts the School Board’s argument that affirming the Court of Appeals’ plurality decision will have a “chilling effect” on school boards, which will now be unsure of the bounds of their discretion. Maj. Op. at ¶ 25. I disagree. It would be perfectly reasonable for this Court to hold that when allegations are made against a student regarding an item that may or may not be prohibited and when the item remains in the control and custody of the school district, the Appeals Committee and School Board must actually examine the item. It would then be within the discretion of the Appeals Committee and School Board to determine whether or not the student has committed misconduct.
¶ 54. The Appeals Committee and School Board should have examined the *406 alleged weapon possessed by R.B. It is patently unfair that both the Appeals Committee and School Board would severely sanction a student for possessing a weapon without verifying that the item in question was actually a weapon. That unfairness is condoned by the majority’s finding that the School Board did not err when it failed to examine the device before expelling R.B.
II.
¶ 55. The majority also concludes that R.B. was afforded due process throughout the review of the allegations that he possessed marijuana. The School Board upheld the Appeals Committee’s recommendation that R.B. be expelled from the school district for one calendar year.
¶ 56. The Supreme Court has held that a student may not be deprived of his or her right to a public education without due process of law. See, e.g., Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725, 734-35 (1975). This Court has held that a school deprives a student of due process when it fails to follow its own procedures. Warren County Bd. of Educ. v. Wilkinson, 500 So.2d 455, 460-61 (Miss.1986). R.B. received written notice of the Appeals Committee hearing regarding the marijuana-related allegations. The notice explicitly provided that he was entitled “[t]o cross-examine or otherwise pose questions to persons giving statements adverse to the student.” In determining that R.B. possessed marijuana, the Appeals Committee and School Board relied on typewritten, signed statements given by two students, J.D. and D.W. The statements are self-exculpatory and, to an extent, do not make sense.[11] R.B. did not have the opportunity to cross-examine or otherwise pose questions to J.D. or D.W. at either the Appeals Committee or School Board hearings. In fact, R.B. was not even permitted to view the two statements until after his expulsion, when the School Board produced them to D.L.B.’s attorney in preparation for the chancery court hearing. R.B. should have been permitted to question the two students. At the very least, R.B. should have been given access to their statements in advance of the Appeal Committee and School Board hearings.
¶ 57. I am not persuaded by the majority’s attempt to distinguish the facts in Wilkinson, 500 So.2d 455, from the facts in this case. The notice R.B. received informed him that he would be permitted to cross-examine or pose questions to individuals who gave statements against him. The majority claims that the entitlements described in the notice were not a part of the “pre-established school district policy.” Maj. Op. at ¶ 35. But the Hinds County School District Policy Handbook states in *407 Section JDE (July 2004) Expulsion that “[although the [Appeals Committee] proceedings will be conducted informally, the student and parent or guardian are entitled by law to: ... Cross-examine or otherwise pose questions to persons giving statements adverse to the student.” Even if the rights listed in the notice were not part of the school’s policy, that does not change the fact that R.B. was explicitly informed by school officials that he would be able to exercise certain rights that he was then denied. Fairness requires that R.B. be afforded the entitlements that the school informs him he has. Fairness requires that R.B. be able to rely on the information provided by the school, especially with respect to his rights.
¶ 58. The School Board stated that R.B. would be permitted to cross-examine or question individuals offering statements against him. Yet the School Board denied him that right. That action was a denial of R.B.’s due process rights. See Wilkinson, 500 So.2d at 460-61. Additionally, the denial of access to these statements violated R.B.’s due process rights. Jones, 524 So.2d at 973 (“Though confrontation may not be an absolute necessity — or even advisable — in every case [of student misconduct], written statements should ordinarily be provided.”). Thus, at the very least, R.B. should have been given copies of the statements by J.D. and D.W. before the Appeals Committee and School Board hearings.
¶ 59. The majority finds that students who report drug activity at school should be able to provide statements against other students without having their identities revealed or being subject to questioning by the accused student. The majority is wary of the risk of retaliation against students who report drug activity. This is a valid concern and may require that student witnesses remain anonymous in other cases. However, in this case, a compelling argument (which the Court of Appeals plurality accepted) was made that R.B. would not have posed a threat to, or attempted to retaliate against, J.D. and D.W. R.B., 10 So.3d at 503, n. 3. R.B. knew the two students because he was in the classroom with them when the incident occurred. Thus, preventing their statements from being viewed by R.B. in order to protect their identities served no purpose.
¶ 60. The majority references R.B.’s “extensive discipline record” to show that R.B. would have been a threat to J.D. and D.W. Maj. Op. at ¶ 36. The record reflects that during the 2003-04 school year, R.B. was punished for one instance each of fighting, insubordination, and being disruptive in class. I do not believe this can fairly be characterized as an “extensive discipline record.”
¶ 61. The majority finds that the School Board cannot produce students to testify as witnesses in disciplinary proceedings because it lacks the subpoena power. Maj. Op. at ¶¶ 14, 32, 37. At the same time, the majority finds that R.B. himself could have produced students to testify in his defense. Maj. Op. at ¶ 37. Firstly, if the School Board cannot produce students to testify, it is highly unlikely that an accused student would be able to persuade a student to testify and subject himself or herself to questions from the School Board. Secondly, an accused student in R.B.’s position may wish to have students, such as J.D. and D.W., testify as adverse witnesses. The risk of retaliation against student witnesses is likely to increase if accused students are responsible for producing them. Students, and perhaps their parents, may solicit other students to testify. There may be tense or heated conversations between students and family members on both sides, particularly when an accused student faces suspension or expulsion. If *408 the student witness decides not to testify, the accused student may be tempted to somehow retaliate. Additionally, placing the burden of production on the accused student could subject him or her to false accusations of retaliation. Not only will accused students face an uphill battle in order to produce student witnesses to testify on their behalf, but they may also risk additional allegations of retaliation against potential student witnesses. Placing the burden of producing student witnesses on the student could potentially lead to numerous other problems developing between students and parents as well. In sum, the majority cannot fairly relieve the School Board of the responsibility of producing student witnesses and then claim that R.B. could and should have produced his own.
¶ 62. Other than the statements of J.D. and D.W., the school offered no direct evidence that R.B. possessed marijuana. The school offered a typewritten statement signed by R.B. stating that J.D. threw him the marijuana, which he then threw onto a bookshelf. The validity of this statement is questionable. The statement is not written in R.B.’s handwriting, but is typewritten and is followed by a number of signatures, including R.B.’s. Before obtaining the statement, Mr. Mohr, the Principal of Main Street Alternative School, told R.B. that they were not going to send him to jail, but that he needed to give a statement. R.B. complied and gave a statement, which was then typed up by Mr. Mohr. Neither of R.B.’s parents were present when the statement was given. R.B. was alone in an office at the school with Mr. Mohr and the school resource officer, Officer Mixon. The testimony reflects that R.B. may have initially been told that he was under arrest. He sat in the office while Mr. Mohr contacted D.L.B. and told him that R.B. had been caught selling marijuana. R.B. was not told that he could decline to give a statement; to the contrary, he was told that the school would keep him out of jail if he provided a statement.
¶ 63. Despite the questionable validity of the statement, both the School Board and the majority rely on an admission contained therein. It was of the utmost importance that R.B. and D.L.B. be given a fair opportunity to defend themselves against the allegations. This should certainly have included the opportunity to cross-examine, or at least view and present arguments undermining the veracity of, the students who gave statements implicating R.B. However, R.B. and D.L.B. were forced to defend against unknown allegations set out in self-exculpatory statements by R.B.’s peers. In a case concerning the discipline of public school students, the Supreme Court stated:
“[Fairness] can rarely be obtained by secret, one-sided determination of facts decisive of rights .... ” “Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.”
Goss, 419 U.S. 565, 580, 95 S.Ct. 729 (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170, 171-72, 71 S.Ct. 624, 648-49, 95 L.Ed. 817, 853-54 (1951) (Frankfurther, J., concurring)). Nonetheless, this Court concludes today that R.B.’s due process rights were satisfied. By failing to even require that students accused of misconduct be permitted access to statements offered against them, the majority sets a low standard indeed for the due process rights of public school students.
*409 ¶ 64. The majority states that “even assuming arguendo that R.B. was denied due process, he has failed to make a showing of substantial prejudice.” Maj. Op. at ¶ 38. Again, I must disagree. The law requires that substantial prejudice be demonstrated in order to show a violation of due process. See, e.g., Jones, 524 So.2d at 972. R.B. has shown that he was substantially prejudiced when he was not given an opportunity to fully present his case to the Appeals Committee. R.B. and D.L.B. were unable to defend against the unknown accusations contained in the student statements that were reviewed and relied upon by the Appeals Committee and School Board. Consequently, the School Board upheld the Appeals Committee’s decision to expel R.B. from the entire school district for one calendar year. For these reasons, I disagree with the majority’s conclusion regarding R.B.’s right to cross-examine J.D. and D.W. Based on Wilkinson, R.B.’s due process rights were violated when he was denied the opportunity to cross-examine J.D. and D.W. or even to review their statements. Wilkinson, 500 So.2d at 460-61.
III.
¶ 65. Aside from the lack of opportunity to question J.D. and D.W. and the lack of access to their statements, R.B.’s due process rights were violated by the lack of notice for the School Board meeting in which the marijuana-related allegations were reviewed. R.B. had a right to be informed of the meeting so that he would have an opportunity to contest the allegations.
¶ 66. The Supreme Court has held that “the State is constrained to recognize a student’s legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.” Goss, 419 U.S. at 574, 95 S.Ct. 729; see also Jones, 524 So.2d at 971 (citing Goss, 419 U.S. 565, 95 S.Ct. 729) (“There is no question that expulsion or suspension from school involves deprivation of a property interest protected by the Due Process clause.”). The Supreme Court further declared that
“[A]t a minimum [the abstract words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.” [Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865, 873 (1950).] “The fundamental requisite of due process of law is the opportunity to be heard.” Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914).
Goss, 419 U.S. at 579, 95 S.Ct. 729; see also Jones, 524 So.2d at 972 (“Thus, at a minimum, the due process clause requires notice and opportunity to be heard.”). The District Court in the Southern District of Mississippi has stated that the Fifth Circuit requires that students subject to long-term suspensions or expulsions be given a hearing that includes “the ‘rudimentary adversary elements,’ ” including notice and the opportunity to contest the allegations. Hill ex rel. Hill v. Rankin County, Miss. Sch. Dist., 843 F.Supp. 1112, 1118 (S.D.Miss.1993). This Court has also recognized the right of students to receive notice of accusations of misconduct so that they can contest them. Jones, 524 So.2d at 971.
¶ 67. R.B. and D.L.B. were not notified of the School Board hearing regarding the marijuana incident, and were thus deprived of the opportunity to present a case to the School Board. The School Board is *410 charged with the weighty responsibility of making final decisions regarding student suspensions and expulsions. Neither the School Board nor the Appeals Committee can merely act as a rubber stamp for the allegations, findings, and recommendations of school officials. See Lee v. Macon County Bd. of Educ., 490 F.2d 458, 460 (5th Cir.1974) (“Formalistic acceptance or ratification of the principal’s request or recommendation as to the scope of punishment, without independent Board consideration of what, under all the circumstances, the penalty should be, is less than full due process.”). When reviewing allegations of student misconduct, the Appeals Committee and School Board must independently review the claims and evidence. Fairness requires that the accused student at least be given notice of the School Board hearing so that he or she can be present to contest the school’s allegations.
¶ 68. The Supreme Court has noted that
[disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.
Goss, 419 U.S. at 580, 95 S.Ct. 729. Certainly, it would not have been prohibitively costly and would not have interfered with the educational process to provide adequate notice through a simple letter to R.B. and D.L.B. informing them of the School Board hearing. Section JDE (July 2004) Expulsion of the Hinds County School District Policy Handbook clearly acknowledges the right of a student “to appear before the school board” when facing an expulsion for thirty days or more. This Court has stated that “though courts should not become involved in running schools, expulsion and suspension are severe sanctions requiring solemn attention to a pupil’s rights.” Jones, 524 So.2d at 973. At the very least, R.B. and D.L.B. should have been notified of the School Board hearing in which it would review the Appeals Committee’s recommendation to expel R.B. from the entire school district for a year.
¶ 69. Again, R.B. suffered prejudice from the lack of notice. He was denied the right to be present and contest the allegations against him before the individuals who would be deciding his punishment. He was denied the bare minimum that due process guarantees' — notice and the opportunity to be heard. See, e.g., Goss, 419 U.S. at 579, 95 S.Ct. 729 (citations omitted). There may be no legal precedent binding on this Court “indicating that R.B. was entitled to two full evidentiary hearings,” but due process requires notice and the opportunity to be heard, especially in cases such as this, where the student’s right to public education is at risk for an extended period of time. Maj. Op. at ¶ 30.
¶ 70. School officials interact on a daily basis with students and may interact regularly with students’ parents as well. It follows that school officials may not always be able to maintain objectivity with regard to certain students and parents. School officials may harbor negative, or even antagonistic, feelings towards certain students and parents. The facts of this case are a helpful illustration of this point. Shortly before the Appeals Committee hearing for the “weapon” — related allegations, D.L.B. had met with Principal Smith of Gary Road Intermediate School. D.L.B. had raised questions challenging the process through which P.T.A. officers were selected. When D.L.B. arrived at a follow-up meeting with Principal Smith, he found that the latter had summoned a *411 member of the police department to his office because he thought that D.L.B. “might get out of hand.” D.L.B. later discovered that Principal Smith was a member of the three-person panel comprising the Appeals Committee reviewing the allegations that R.B. possessed a weapon. The earlier interactions between Principal Smith and D.L.B. left D.L.B. with serious doubts as to whether Principal Smith and the Appeals Committee panel would exercise the necessary objectivity with respect to the accusations against R.B.
¶ 71. In situations such as this, it is crucial that the Appeals Committee and School Board diligently, conscientiously, and impartially review all the relevant evidence, hear both sides’ versions of events, and determine the culpability, if any, of the student as well as the appropriate punishment. In reaching these determinations, the Appeals Committee and School Board should be mindful of the negative impact that their decisions can have on the futures of young students — especially in the case of suspensions and expulsions. The right to a public education is a fundamental right protected by states. Clinton Mun. Separate Sch. Dist. v. Byrd, 477 So.2d 237, 240 (Miss.1985). This Court has held that “the right to a minimally adequate public education created and entailed by the laws of this state is one we can only label fundamental.” Id.; see also Hill ex rel. Hill v. Rankin County, Miss. Sch. Dist., 843 F.Supp. 1112, 1117 (S.D.Miss.1993) (stating that Mississippi Code Section 37-1-2 provides the children of Mississippi the right to a free public education). In the landmark decision, Brown v. Board of Education, the Supreme Court stated that
education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society .... It is the very foundation of good citizenship .... [I]t is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment ... [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.
Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954).
¶ 72. In Goss v. Lopez, the Supreme Court recognized that the charges of misconduct lodged against several students “could seriously damage the students’ standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.” Goss, 419 U.S. at 575, 95 S.Ct. 729. Undoubtedly, the punishments accompanying the charges can do similar, if not greater, harm to a student’s future. In recent years, public schools have engaged in increasingly punitive practices with regard to students who misbehave. NAACP Legal Defense and Educational Fund, Inc., Dismantling the Sehool-to-P-rison Pipeline 1 (2006). The NAACP Legal Defense and Educational Fund (LDF) has reported that “the punitive and overzealous tools and approaches of the modern criminal justice system [that] have seeped into our schools ... hasten [students’] entry into the juvenile, and eventually the criminal, justice system, where prison is the end of the road.” Id. Others have found this to be true as well: students who are suspended are at high risk of being disciplined again, dropping out of school, and entering the juvenile justice system. Miriam Rokeach & John Denvir, FronL-Loading Due Process: A Dignity-Based Approach to School Discipline, 67 Ohio St. L.J. 277, 284-6 (2006). This phe *412 nomenon is commonly referred to as the school-to-prison pipeline or the schoolhouse-to-jailhouse track. See, e.g., Avarita L. Hanson, Have Zero Tolerance School Discipline Policies Turned into a Nightmare? The American Dream’s Promise of Equal Educational Opportunity Grounded in Brown v. Board of Education, 9 UC Davis J. Juv. L. & Pol’y 289, 340 (2005).
¶ 73. Because of fears of school violence, public school officials have turned to harsh disciplinary policies including mandatory zero-tolerance policies, which often result in suspensions and expulsions that remove students from their schools. Frances P. Solari & Julienne E.M. Bal-shaw, Outlaws and Exiled: Zero Tolerance and Second Generation Race Discrimination in Public Schools, 29 N.C. Cent. L.J. 147, 149 (2007); Rokeach & Denvir, supra, at 282; NAACP Legal Defense and Educational Fund, Inc., supra, at 2. However, “[a] study of school violence ... found that after four years of implementing zero tolerance policies, schools employing zero tolerance reported greater levels of discipline problems than schools without zero tolerance.” Rokeach & Denvir, supra, at 284.
¶ 74. Increasing numbers of children are removed from public schools for increasingly minor conduct. NAACP Legal Defense and Educational Fund, Inc., supra, at 2-3; see also Rokeach & Denvir, supra, at 284. When faced with disciplining students, school boards are often focused on a quick, simple solution — ridding the school of the “problem students,” who are then left “out in the community, unsupervised and unsupported.” Rokeach & Denvir, supra, at 280-82. This has serious consequences for children who are removed from school for even a few days. It has been pointed out that “[w]hen kids are removed from school, they end up in inferior settings such as suspension centers, alternative schools, and juvenile prisons — places where meaningful educational services are practically nonexistent and students with histories of behavioral problems can negatively influence one another.” NAACP Legal Defense and Educational Fund, Inc., supra, at 4; Augustina Reyes, The Criminalization of Student Discipline Programs and Adolescent Behavior, 21 St. John’s J.L. Comm. 73, 78 (2006). This observation resonates with the facts of this case. When R.B. was expelled from Byram Middle School, he was sent to Main Street Alternative School. At the alternative school, R.B. and several other students were left unsupervised in a classroom and someone brought out some marijuana. Every morning before R.B. went to the alternative school, he was searched at home by D.L.B. and then, when he got to school, he was searched by security officers. On the day of the marijuana incident, R.B. was only carrying three books, without a backpack, and $1.50 in his pocket for lunch. He was only wearing jeans and a t-shirt because coats were not permitted. Despite his basic attire and lack of personal belongings, R.B. was expelled for possession of marijuana[12].
¶ 75. By concluding that the Hinds County School Board properly expelled R.B. from Byram Middle School and from the entire school district, the majority has dealt a serious blow to the due process rights of our public school students. Not only did the Appeals Committee and School Board never view the alleged weapon possessed by R.B., but the Appeals *413 Committee denied him the right to question student witnesses, and the School Board denied him the basic right to notice. For all the reasons stated herein, I respectfully dissent.
DIAZ, P.J., AND EASLEY, J., JOIN THIS OPINION. DICKINSON, J., JOINS THIS OPINION IN PART.

. It should be noted that, as the Court of Appeals plurality points out, D.L.B. and R.B. were permitted five minutes to speak at the School Board meeting, but were excluded from the rest of the meeting, including the portion during which the school presented evidence against R.B. Hinds County Sch. Dist. Bd. of Trs. v. R.B., No.2006-CA-00326-COA, 10 So.3d 495, 508 (Miss.Ct.App.2007).

. J.D.’s entire statement reads as follows: "I, LJ.D.], admit to when I came to school I bought some 'weed' (marijuana) from [C.B.] at school and then bought some more marijuana from [Z.M.] and then gave all the marijuana to [R.B.] and [R.B.] tried to frame me for it by hiding it in his desk.”
D.W.'s entire statement reads as follows:
[R.B.] and [J.D.], they the ones who had it, they were trading it back and forth. [R.B.] had most of it and [J.D.] was asking for change to buy some from [R.B.]. [J.D.] asked [C.J and [C.] said I am not fixing to get involved with ya'll. [R.B.] sold some to [B.] and gave or sold some to [G.]. [R.B.] was supposed to put it in the bathroom, but [G.] couldn't find it so he told LR.B.] he wanted his money back. [R.B.] said, T put it up there, so it is just ya'll’s problem.’
[R.B.] has it at school. [R.B.] showed the marijuana. [R.B.] also showed the money. [R.B.] said [BJ is my # 1 costomer [sic]. [R.B.] was also talking to [Z.]. These conversations occurred in Butler’s, Mixon's and John's rooms.
[C.L.] said that whoever had weed needed to hide it (Mrs. John's room).

. The initial allegations against R.B. were that he possessed and attempted to conceal and sell marijuana.